**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| TIGO ENERGY INC. | Civil Action No. _____ |
| *Plaintiff,* | |
| v. | **JURY TRIAL DEMANDED** |
| SMA SOLAR TECHNOLOGY AMERICA LLC | |
| *Defendant.* | |

**PLAINTIFF'S COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiff Tigo Energy Inc. ("Tigo") brings this Complaint for patent infringement against Defendant SMA Solar Technology America LLC ("SMA" or "Defendant") and alleges as follows:

**THE PARTIES**

1.     Tigo is a Delaware corporation, having its principal place of business at 655 Campbell Technology Pkwy., Campbell, CA 95008.

2.     On information and belief, SMA is a limited liability company organized and existing under the laws of Delaware. SMA has a registered agent at Incorporating Services, Ltd., 3500 S DuPont Highway, Dover, Delaware 19901.

**JURISDICTION AND VENUE**

3.     This action arises under the patent laws of the United States, Title 35 of the United States Code. Accordingly, this Court has exclusive subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1338(a).

4.     Upon information and belief, SMA is subject to this Court's specific and general personal jurisdiction pursuant to due process and/or the Delaware Long Arm Statute, due at least to its

substantial business in this State and judicial district, including: (A) at least part of its infringing activities alleged herein; and (B) regularly doing or soliciting business, engaging in other persistent conduct, and/or deriving substantial revenue from infringing goods offered for sale, sold, and imported and services provided to Delaware residents vicariously through and/or in concert with its intermediaries, distributors, importers, customers and/or subsidiaries. SMA has purposefully availed itself of the privileges of conducting business in the United States and, more specifically, in Delaware and this District. SMA has sought protection and benefit from the laws of the State of Delaware by placing the Accused Products into the stream of commerce through an established distribution channel with awareness and/or intent that they will be purchased and/or installed by consumers in this District.

5.    Venue is proper in this district as to SMA under 28 U.S.C. §§ 1391 and 1400(b) because, among other reasons, SMA is a limited liability company organized and existing under the laws of Delaware.

## THE ASSERTED PATENTS

6.    Tigo has been a technology leader in photovoltaic safety for many years, and has been awarded many patents, including U.S. Patent Nos. 8,823,218 (the "'218 patent"), 8,933,321 (the "'321 patent"), 9,584,021 (the "'021 patent"), 9,966,848 (the "'848 patent"), 10,256,770 (the "'770 patent"), and 10,333,405 (the "'405 patent") (collectively the "Asserted Patents").

7.    The '218 patent is titled "System and method for enhanced watch dog in solar panel installations" and was duly and legally issued by the United States Patent and Trademark Office on September 2, 2014.  Tigo is the owner and assignee of all substantial rights in the '218 patent, a copy of which is attached as Exhibit 1.

8.    The '321 patent is titled "Systems and methods for an enhanced watchdog in solar module installations" and was duly and legally issued by the United States Patent and Trademark Office on January 13, 2015.  Tigo is the owner and assignee of all substantial rights in the '321 patent,

a copy of which is attached as Exhibit 2.

9.     The '021 patent is titled "Systems and methods for enhanced efficiency auxiliary power supply module" and was duly and legally issued by the United States Patent and Trademark Office on February 28, 2017.  Tigo is the owner and assignee of all substantial rights in the '021 patent, a copy of which is attached as Exhibit 3.

10.     The '848 patent is titled "Systems and methods for enhanced efficiency auxiliary power supply module" and was duly and legally issued by the United States Patent and Trademark Office on May 8, 2018.  Tigo is the owner and assignee of all substantial rights in the '848 patent, a copy of which is attached as Exhibit 4.

11.     The '770 patent" is titled "System and method for enhanced watch dog in solar panel installations" and was duly and legally issued by the United States Patent and Trademark Office on April 9, 2019.  Tigo is the owner and assignee of all substantial rights in the '770 patent, a copy of which is attached as Exhibit 5.

12.     The '405 patent is titled "Systems and methods for enhanced efficiency auxiliary power supply module" and was duly and legally issued by the United States Patent and Trademark Office on June 25, 2019.  Tigo is the owner and assignee of all substantial rights in the '405 patent, a copy of which is attached as Exhibit 6.

## BACKGROUND ON THE TECHNOLOGY

13.     National Electric Code § 690.12, "Rapid Shutdown of PV Systems on Buildings," requires that photovoltaic system circuits "installed on or in buildings shall include a rapid shutdown function to reduce shock hazard for emergency responders."

14.     Tigo is a leader in module-level rapid-shutdown technology.  Tigo's products include module-level rapid shutdown units that are attached to photovoltaic panels, such as its TS4-A-F

product.  The Tigo TS4-A-F works in conjunction with a transmitter, such as the Tigo RSS (Rapid Shutdown System) Transmitter, in order to provide a photovoltaic system that complies with the rapid-shutdown requirements of National Electric Code § 690.12.  Tigo's TS4-A-F and RSS Transmitter products are pictured below:

Tigo TS4-A-F:                                         Tigo RSS Transmitter:



15.     Tigo has delivered more than 1 million rapid-shutdown products to end users.

16.     On information and belief, SMA and its suppliers copied Tigo's product line in order to compete in the business of offering for sale, selling, and distributing products designed to enable photovoltaic systems to comply with the rapid shutdown requirements of National Electric Code § 690.12.     See,     e.g.,     https://www.sma-america.com/products/sunspec-certified-rapid-shutdown-technology.html ("SMA inverters paired with SunSpec certified rapid shutdown technology are the simplest, most reliable way to achieve compliance with NEC 2017 while producing more energy than

traditional optimizers.").

17.    SMA's products include the JMS-F rapid shutdown device pictured below right.  Like Tigo's TS4-A-F, the JMS-F rapid shutdown device is a module-level rapid shutdown unit that is attached to individual photovoltaic panels.

Tigo TS4-A-F:                                   JMS-F rapid shutdown device:

           

See, e.g., https://www.sma-america.com/products/sunspec-certified-rapid-shutdown-technology/jms-f-sunspec-rapid-shutdown-device.html.

18.    SMA's products also include inverters, including for example the Sunny Boy 3.0-US / 3.8-US / 5.0-US / 6.0-US / 7.0-US / 7.7-US and the Sunny Tripower Core1 33-US / 50-US / 62-US ("SMA inverters") which employ "SunSpec rapid shutdown technology" and are specifically designed and advertised to be used in combination with a rapid shutdown device, including the JMS-F rapid shutdown device.



https://www.sma-america.com/products/sunspec-certified-rapid-shutdown-technology.html.

19. Like the Tigo RSS Transmitter, the SMA inverters provide a watchdog signal, e.g., a SunSpec signal, to a rapid shutdown device, e.g., the JMS-F shutdown device, for rapid shutdown along the powerline to enable a photovoltaic system that complies with NEC § 690.12. *See* Exhibit 7, JMS-F Rapid Shutdown Box Ver 3.0 Installation Manual ("JMS-F Installation Manual") at 5 ("The signal is transmitted by the inverter with built-in transmitter function through the DC bus. . . . When an emergency situation occurs, the AC power can be turned off by switching the AC breaker in the cabinet, so that the inverter with built in transmitter function stops sending signals, and the JMS-F will shutdown power output . . ."), 10-12. *See also* Exhibit 8, Sunny Boy 3.0-US / 3.8-US / 5.0-US / 6.0-US / 7.0-US / 7.7-US Datasheet ("Sunny Boy Datasheet") at 3 ("The SMA Energy System Home combines legendary SMA inverter performance and SunSpec certified shutdown devices in one cost-

effective, comprehensive package. . . . This rapid shutdown solution fulfills UL 1741, NEC 2014, and NEC 2017 requirements and is certified to the power line-based SunSpec Rapid Shutdown communication signal over DC wires, making it the most simple and cost-effective rapid shutdown solution on the market."); Exhibit 9, Sunny Boy 3.0-US / 3.8-US / 5.0-US / 6.0-US / 7.0-US / 7.7-US Installation Manual ("Sunny Boy Installation Manual") at 20 ("A complete PV Rapid Shutdown System consists of the inverter, PV array disconnect switches, and a Rapid Shutdown initiation device. The Rapid Shutdown initiation device serves to initiate a rapid shutdown. The PV Rapid Shutdown System must limit the DC conductors to < 30 V within 30 seconds.").

20.     On information and belief, SMA has made, used, sold, offered to sell, imported, installed and/or have had installed the JMS-F rapid shutdown device and/or SMA inverters (the "Accused Products") in Delaware.

## COUNT I
### (INFRINGEMENT OF U.S. PATENT NO. 8,823,218)

21.     Plaintiff repeats and realleges paragraphs 1-20 as if fully set forth at length herein.

22.     SMA has and continues to directly infringe one or more claims of the '218 patent in this judicial district and elsewhere in the United States.

23.     Upon information and belief, SMA makes, uses, sells, offers for sale, and/or imports into the United States the Accused Products.

24.     SMA directly infringes the '218 patent under 35 U.S.C. § 271(a), literally and/or under the doctrine of equivalents, by making, using, offering for sale, selling, and/or importing the Accused Products in the United States.

25.     For example, SMA directly infringes at least Claim 1 of the '218 patent, literally and/or under the doctrine of equivalents, through its making, using, offering for sale, selling, and/or importing the Accused Products.

26.     Claim 1 of the '218 patent recites:

1. A system comprising:

a master management unit (MMU); and

a local management unit (LMU) in communication with the master management unit (MMU),
the LMU controlling one or more solar modules;

wherein the MMU is connected to at least one sensor, the sensor configured to detect an
anomaly; and

wherein upon detection of the anomaly by the sensor, the MMU sends a command to the LMU
to alter the state of an associated solar module; and

wherein upon receiving a command from the MMU, the LMU alters the state of the one or
more solar modules in accordance with command.

27.     As one non-limiting example of said infringement, on information and belief, the JMS-

F device and SMA inverter comprise a system including a master management unit (e.g., in the SMA

inverter):



Exhibit 10, JMS-F SunSpec Rapid Shutdown Device Datasheet ("JMS-F Datasheet") at 2. *See also*

Exhibit 9, Sunny Boy Installation Manual at 20 ("A complete PV Rapid Shutdown System consists of

the inverter, PV array disconnect switches, and a Rapid Shutdown initiation device."); Exhibit 8, Sunny

Boy Datasheet at 3 (describing the SMA Energy System Home as combining the SMA inverter and

SunSpec certified shutdown device "in one cost-effective, comprehensive package"):

## THE SMA ENERGY SYSTEM HOME

The SMA Energy System Home combines legendary SMA inverter performance and SunSpec certified shutdown devices in one cost-effective, comprehensive package. In addition, SMA ShadeFix technology optimizes power production and provides greater reliability than alternatives.

This rapid shutdown solution fulfills UL 1741, NEC 2014, and NEC 2017 requirements and is certified to the power line-based SunSpec Rapid Shutdown communication signal over DC wires, making it the most simple and cost-effective rapid shutdown solution on the market.

**Visit www.SMA-America.com for more information.**



28.     On information and belief, the JMS-F comprises a local management unit (LMU) in communication with the master management unit (MMU) (e.g., in the SMA inverter), the LMU controlling one or more solar modules (e.g., the PV module):



Exhibit 10, JMS-F Datasheet at 2.

29.     On information and belief, the SMA inverter comprises at least one sensor connected

to the MMU, the sensor configured to detect an anomaly (e.g., arc-fault and ground-fault conditions):

| Protection devices | | |
| --- | --- | --- |
| DC disconnect device / DC reverse polarity protection | | ● / ● |
| Ground fault monitoring / Grid monitoring | | ● |
| AC short circuit protection | | ● |
| All-pole sensitive residual current monitoring unit (RCMU) | | ● |
| Arc fault circuit interrupter (AFCI) | | ● |
| Protection class / overvoltage category | | I / IV |

Exhibit 8, Sunny Boy Datasheet at 2, 3.

30.     On information and belief, when a sensor in the SMA inverter detects an anomaly, the

MMU in the SMA inverter sends a command to the LMU (e.g., in the JMS-F device) to alter the state

of an associated solar module (e.g., commands to shut down the associated solar module):

## 2. Function Description

The JMTHY JMS-F is qualified as PV rapid shutdown equipment (PVRSE) which can achieve module-level rapid shutdown. Which in turn will significantly improve the safety of PV power generation systems. JMS-F uses PLC communication. The signal is transmitted by the inverter with built-in transmitter function through the DC bus. After JMS-F receives the signal, the switch turns on and the energy generated by the PV module will be delivered to the AC grid through the inverter. When an emergency situation occurs, the AC power can be turned off by switching off the AC breaker in the cabinet, so that the inverter with built-in transmitter function stops sending signals, and the JMS-F will shutdown the power output, then eliminate the high voltage on DC bus, it can improve the safety of the PV system.

Exhibit 7, JMS-F Installation Manual at 5.

31.     Upon information and belief, when the command from the MMU (e.g., in the SMA

inverter) is received by the LMU (e.g., in the JMS-F device), the LMU alters the state of the one or

more solar modules in accordance with the command (e.g., shuts down the associated solar module):

## 2. Function Description

The JMTHY JMS-F is qualified as PV rapid shutdown equipment (PVRSE) which can achieve module-level rapid shutdown. Which in turn will significantly improve the safety of PV power generation systems. JMS-F uses PLC communication. The signal is transmitted by the inverter with built-in transmitter function through the DC bus. After JMS-F receives the signal, the switch turns on and the energy generated by the PV module will be delivered to the AC grid through the inverter. When an emergency situation occurs, the AC power can be turned off by switching off the AC breaker in the cabinet, so that the inverter with built-in transmitter function stops sending signals, and the JMS-F will shutdown the power output, then eliminate the high voltage on DC bus, it can improve the safety of the PV system.

Exhibit 7, JMS-F Installation Manual at 5.

32.     The full extent of SMA's infringement is not presently known to Plaintiff. On information and belief, SMA has made, used, sold, offered for sale, and/or imported products under different names or part numbers that infringe the '218 patent in a similar manner. Plaintiff makes this preliminary identification of infringing products and infringed claims without the benefit of discovery or claim construction in this action, and expressly reserves the right to augment, supplement, and/or revise its identification based on additional information obtained through discovery or otherwise.

33.     On information and belief, SMA has known of the '218 patent and its use by SunSpec-compliant rapid-shutdown devices since at least as early as 2018.

34.     On October 1, 2021, Tigo sent SMA a letter notifying SMA of its infringement of the '218 patent.

35.     Upon information and belief, since at least the above-mentioned date when SMA was on notice of its infringement, SMA has actively induced, under U.S.C. § 271(b), its distributors and/or

customers that use, sell, offer for sale, import, and/or install the Accused Products that include all of the limitations of one or more claims of the '218 patent to directly infringe one or more claims of the '218 patent, with knowledge, and/or with willful blindness of the fact, that the induced acts constitute infringement of the '218 patent. SMA's distributors, customers, installers and/or end users have directly infringed and are directly infringing, either literally and/or under the doctrine of equivalents, the inventions claimed in the '218 patent through their selling, offering for sale, importing, installing and/or using the Accused Products. SMA induces this direct infringement through its affirmative acts of manufacturing, selling, distributing, and/or otherwise making available the Accused Products, and providing technical guides, product datasheets, demonstrations, advertisements, installation guides, user manuals and other forms of support that induce its distributors, customers, and/or end users to directly infringe the '218 patent. The Accused Products are designed in such a way that when they are used for their intended purpose, the user infringes the '218 patent. SMA knows and intends that its distributors, customers, installers and/or end users that purchase the Accused Products will use those products for their intended purpose.

36.     By continuing to make, use, sell, offer to sell, and/or import the Accused Products after SMA first had notice of Tigo's allegations of infringement, SMA has indirectly infringed and continues to indirectly infringe by contributing to the infringement of one or more claims of the '218 patent pursuant to 35 U.S.C. § 271(c).  Defendant's affirmative acts of manufacturing, selling, offering for sale, and/or importing the Accused Products, in this District and elsewhere in the United States, contribute to Defendant's customers and end-users directly infringing the '218 patent with the Accused Products.  The Accused Products are not a staple article or commodity of commerce, have no substantial non-infringing uses, and are known by SMA to be especially made and/or especially adapted for use in infringement of the '218 patent.  SMA has performed and continues to perform these

affirmative acts with knowledge of the '218 patent and with the intent, or willful blindness, that they cause the direct infringement of the '218 patent.

37.     On information and belief, Tigo has suffered and continues to suffer damages as a result of SMA's infringement of the '218 patent in an amount to be determined at trial.

38.     On information and belief, SMA's infringement of the '218 patent is causing irreparable harm for which Tigo has no adequate remedy at law unless SMA is enjoined by this Court. Under 35 U.S.C. § 283, Tigo is entitled to a permanent injunction against further infringement of the '218 patent.

39.     On information and belief, SMA has continued with its infringement after receiving notice from Tigo, despite the objectively high likelihood that its actions constitute infringement and SMA's subjective knowledge of this obvious risk.  As SMA has no good faith belief that it does not infringe the '218 patent, SMA's continued infringement is willful and deliberate, entitling Tigo to increased damages under 35 U.S.C. § 284 and to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

## **COUNT II**
### (INFRINGEMENT OF U.S. PATENT NO. 8,933,321)

40.     Plaintiff repeats and realleges paragraphs 1- 39 as if fully set forth at length herein.

41.     SMA has and continues to directly infringe one or more claims of the '321 patent in this judicial district and elsewhere in the United States.

42.     Upon information and belief, SMA makes, uses, sells, offers for sale, and/or imports into the United States the Accused Products.

43.     SMA directly infringes the '321 patent under 35 U.S.C. § 271(a), literally and/or under the doctrine of equivalents, by making, using, offering for sale, selling, and/or importing the Accused Products in the United States.

44.     For example, SMA directly infringes at least Claim 1 of the '321 patent, literally and/or under the doctrine of equivalents, through its making, using, offering for sale, selling, and/or importing the Accused Products.

45.     Claim 1 of the '321 patent recites:

A system comprising:

a watchdog unit coupled between a solar module and a power bus, the power bus configured to connect a plurality of solar modules to an inverter, the watchdog unit having:

a local controller configured to monitor a communication from a central controller remote from the solar module and determine whether the communication has been interrupted for a time period longer than a predetermined number of allowed skips; and

at least one switch configured to disconnect the solar module from the power bus in response to a determination by the location controller that the communication from the central controller has been interrupted for a time period longer than the predetermined number of allowed skips;

wherein the watchdog unit is configured to connect the solar module to the power bus when the communication is not interrupted.

46.     As one non-limiting example of said infringement, on information and belief, the JMS-F device is part of a system in which it is a watchdog unit coupled between a solar module (e.g., PV module) and a power bus (e.g., DC lines shown in green below), the power bus configured to connect a plurality of solar modules to an inverter (e.g., the SMA inverter):



Exhibit 10, JMS-F Datasheet at 2.

47.     On information and belief, the JMS-F comprises a local controller configured to monitor a communication (e.g., a signal such as a SunSpec signal) from a central controller remote from the solar module (e.g., the SMA inverter) and determine whether the communication has been interrupted for a time period longer than a predetermined number of allowed skips:

## 6. Initiating Rapid Shutdown



When the AC breaker is turned off, the inverter with built-in transmitter function stops sending the signal "permission-to-operate" through the DC bus. JMS-F does not receive the signal and waits for 10 seconds to enter the turn-off mode. Then the MOSFET Q3 is activated and the MOSFET Q2/Q20 is deactivated, the output voltage of JMS-F is 1 Volt, and the PV system is in the no-load state.

### Rapid shutdown steps:

STEP1: Switch off the AC breaker on the AC side of the PV system.

STEP2: The inverter with built-in transmitter function stops sending signals, thus initiating rapid shutdown.

STEP3: Each JMS-F does not receive the signal then executing rapid shutdown, the output voltage of each JMS-F is 1 Volt.

STEP4: At the final stage the DC bus voltage of the PV system drops to below 30 Volts within 30 seconds.

Exhibit 7, JMS-F Installation Manual at 11.

48.     On information and belief, the JMS-F comprises at least one switch configured to disconnect the solar module from the power bus (e.g., cause a rapid shutdown) in response to a determination by the location controller that the communication (e.g., a signal such as a SunSpec

signal) from the central controller (e.g., the SMA inverter) has been interrupted for a time period longer than the predetermined number of allowed skips:

## 6. Initiating Rapid Shutdown



When the AC breaker is turned off, the inverter with built-in transmitter function stops sending the signal "permission-to-operate" through the DC bus. JMS-F does not receive the signal and waits for 10 seconds to enter the turn-off mode. Then the MOSFET Q3 is activated and the MOSFET Q2/Q20 is deactivated, the output voltage of JMS-F is 1 Volt, and the PV system is in the no-load state.

### Rapid shutdown steps:

STEP1: Switch off the AC breaker on the AC side of the PV system.

STEP2: The inverter with built-in transmitter function stops sending signals, thus initiating rapid shutdown.

STEP3: Each JMS-F does not receive the signal then executing rapid shutdown, the output voltage of each JMS-F is 1 Volt.

STEP4: At the final stage the DC bus voltage of the PV system drops to below 30 Volts within 30 seconds.

Exhibit 7, JMS-F Installation Manual at 11.

49.     On information and belief, the JMS-F is configured to connect the solar module to the

power bus when the communication is not interrupted:

## 2. Function Description

The JMTHY JMS-F is qualified as PV rapid shutdown equipment (PVRSE) which can achieve module-level rapid shutdown. Which in turn will significantly improve the safety of PV power generation systems. JMS-F uses PLC communication. The signal is transmitted by the inverter with built-in transmitter function through the DC bus. After JMS-F receives the signal, the switch turns on and the energy generated by the PV module will be delivered to the AC grid through the inverter. When an emergency situation occurs, the AC power can be turned off by switching off the AC breaker in the cabinet, so that the inverter with built-in transmitter function stops sending signals, and the JMS-F will shutdown the power output, then eliminate the high voltage on DC bus, it can improve the safety of the PV system.

Exhibit 7, JMS-F Installation Manual at 5.

50.     The full extent of SMA's infringement is not presently known to Plaintiff. On information and belief, SMA has made, used, sold, offered for sale, and/or imported products under different names or part numbers that infringe the '321 patent in a similar manner. Plaintiff makes this preliminary identification of infringing products and infringed claims without the benefit of discovery or claim construction in this action, and expressly reserves the right to augment, supplement, and/or revise its identification based on additional information obtained through discovery or otherwise.

51.     On information and belief, SMA has known of the '321 patent and its use by SunSpec-compliant rapid-shutdown devices since at least as early as 2018.

52.     On October 1, 2021, Tigo sent SMA a letter notifying SMA of its infringement of the '321 patent.

53.     Upon information and belief, since at least the above-mentioned date when SMA was on notice of its infringement, SMA has actively induced, under U.S.C. § 271(b), its distributors and/or

customers that use, sell, offer for sale, import, and/or install the Accused Products that include all of the limitations of one or more claims of the '321 patent to directly infringe one or more claims of the '321 patent, with knowledge, and/or with willful blindness of the fact, that the induced acts constitute infringement of the '321 patent. SMA's distributors, customers, installers and/or end users have directly infringed and are directly infringing, either literally and/or under the doctrine of equivalents, the inventions claimed in the '321 patent through their selling, offering for sale, importing, installing and/or using the Accused Products. SMA induces this direct infringement through its affirmative acts of manufacturing, selling, distributing, and/or otherwise making available the Accused Products, and providing technical guides, product datasheets, demonstrations, advertisements, installation guides, user manuals and other forms of support that induce its distributors, customers, and/or end users to directly infringe the '321 patent. The Accused Products are designed in such a way that when they are used for their intended purpose, the user infringes the '321 patent. SMA knows and intends that its distributors, customers, installers and/or end users that purchase the Accused Products will use those products for their intended purpose.

54.     By continuing to make, use, sell, offer to sell, and/or import the Accused Products after SMA first had notice of Tigo's allegations of infringement, SMA has indirectly infringed and continues to indirectly infringe by contributing to the infringement of one or more claims of the '321 patent pursuant to 35 U.S.C. § 271(c). Defendant's affirmative acts of manufacturing, selling, offering for sale, and/or importing the Accused Products, in this District and elsewhere in the United States, contribute to Defendant's customers and end-users directly infringing the '321 patent with the Accused Products. The Accused Products are not a staple article or commodity of commerce, have no substantial non-infringing uses, and are known by SMA to be especially made and/or especially adapted for use in infringement of the '321 patent. Defendant has performed and continues to perform

these affirmative acts with knowledge of the '321 patent and with the intent, or willful blindness, that they cause the direct infringement of the '321 patent.

55.     On information and belief, Tigo has suffered and continues to suffer damages as a result of SMA's infringement of the '321 patent in an amount to be determined at trial.

56.     On information and belief, SMA's infringement of the '321 patent is causing irreparable harm for which Tigo has no adequate remedy at law unless SMA is enjoined by this Court. Under 35 U.S.C. § 283, Tigo is entitled to a permanent injunction against further infringement of the '321 patent.

57.     On information and belief, SMA has continued with its infringement after receiving notice from Tigo, despite the objectively high likelihood that its actions constitute infringement and SMA's subjective knowledge of this obvious risk.  As SMA has no good faith belief that it does not infringe the '321 patent, SMA's continued infringement is willful and deliberate, entitling Tigo to increased damages under 35 U.S.C. § 284 and to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

## **COUNT III**
### (INFRINGEMENT OF U.S. PATENT NO. 9,584,021)

58.     Plaintiff repeats and realleges paragraphs 1-57 as if fully set forth at length herein.

59.     SMA has and continues to directly infringe one or more claims of the '021 patent in this judicial district and elsewhere in the United States.

60.     Upon information and belief, SMA makes, uses, sells, offers for sale, and/or imports into the United States the Accused Products.

61.     SMA directly infringes the '021 patent under 35 U.S.C. § 271(a), literally and/or under the doctrine of equivalents, by making, using, offering for sale, selling, and/or importing the Accused Products in the United States.

62.     For example, SMA directly infringes at least Claim 10 of the '021 patent, literally and/or under the doctrine of equivalents, through its making, using, offering for sale, selling, and/or importing the Accused Products.

63.     Claim 10 of the '021 patent recites:

A system to supply power, the system comprising:

a power source to provide a direct current input;

a first stage power converter configured to convert the direct current input into a first output;

a second stage power converter configured to be powered by the first output to generate a second output;

a micro-controller powered by the second output;

a switchable load; and

a control circuit powered by the first output and configured to

connect the first output to the switchable load to consume at least a portion of the first output while disabling the second stage power converter in supplying the second output to the micro-controller;

determine whether a voltage of the first output powering the switchable load is above a threshold during a time period in which the second output to the micro-controller is disabled; and

in response to the voltage being above the threshold during the time period in which the second output to the micro-controller is disabled, disconnect the switchable load from the first output of the first stage power converter and signal the second stage power converter to enable the second output to the micro-controller using power from the first output of the first stage power converter.

64.     As one non-limiting example of said infringement, on information and belief, the JMS-F device is part of a system designed to supply power in which the JMS-F device receives a direct current input, such as from a photovoltaic panel:



Exhibit 10, JMS-F Datasheet at 2.

65.     On information and belief, the JMS-F devices comprise electronic circuitry that includes a two-stage power converter at least partially within the box labelled MCU in the figure below, wherein the first stage power converter is configured to convert the direct current input into a first output, and the second stage power converter is configured to be powered by the first output to generate a second output:

## 5. Turn-on Mode of JMS-F



When the AC breaker is closed, the inverter with built-in transmitter function sends the signal "permission-to-operate" through the DC bus. JMS-F receives the signal and enters the turn-on mode. Then the MOSFET Q3 is turned off and the MOSFET Q2/Q20 is turned on. JMS-F turns on and the energy generated by the PV module will be delivered to the AC grid through the inverter.

Exhibit 7, JMS-F Installation Manual at 10.

66.    On information and belief, the JMS-F devices comprise a micro-controller powered by the second output, as shown in the image below of the circuit board from the JMS-F:



67.     On information and belief, the JMS-F device contains electronic circuitry in the micro-controller identified above that includes a two-stage power converter. The first stage of this power converter receives a direct current input from PV module, and provides that power to either a power absorption circuit or to the second stage of the power converter in the integrated circuit identified above. The JMS-F device's control circuit powers the absorption circuit from the first stage of the power converter until it determines that the available power from the module is above a threshold sufficient to hold approximately 8V on an appropriate load (e.g., holding 8V while drawing approximately 15 mA). The JMS-F device's control circuit then disconnects the first stage of the power converter from the power absorption circuit and causes the second stage of the power converter to begin providing power to the microcontroller.

68.     Thus, on information and belief the JMS-F devices comprise a control circuit powered by the first output and configured to connect the first output to the switchable load to consume at least

a portion of the first output while disabling the second stage power converter in supplying the second output to the micro-controller; determine whether a voltage of the first output powering the switchable load is above a threshold during a time period in which the second output to the micro-controller is disabled; and in response to the voltage being above the threshold during the time period in which the second output to the micro-controller is disabled, disconnect the switchable load from the first output of the first stage power converter and signal the second stage power converter to enable the second output to the micro-controller using power from the first output of the first stage power converter.

69.     The full extent of SMA's infringement is not presently known to Plaintiff.   On information and belief, SMA has made, used, sold, offered for sale, and/or imported products under different names or part numbers that infringe the '021 patent in a similar manner. Plaintiff makes this preliminary identification of infringing products and infringed claims without the benefit of discovery or claim construction in this action, and expressly reserves the right to augment, supplement, and revise its identification based on additional information obtained through discovery or otherwise.

70.     SMA has had notice of and have been aware of the '021 patent and its infringement of the '021 patent by no later than October 1, 2021, when Tigo sent SMA a letter notifying SMA of its infringement of the '021 patent.

71.     Upon information and belief, since at least the above-mentioned date when SMA was on notice of its infringement, SMA has actively induced, under U.S.C. § 271(b), its distributors and/or customers that use, sell, offer for sale, import and/or install the Accused Products that include all of the limitations of one or more claims of the '021 patent to directly infringe one or more claims of the '021 patent, with knowledge, and/or with willful blindness of the fact, that the induced acts constitute infringement of the '021 patent. SMA's distributors, customers, installers and/or end users have directly infringed and are directly infringing, either literally and/or under the doctrine of equivalents,

the inventions claimed in the '021 patent through their selling, offering for sale, importing, installing and/or using the Accused Products. SMA induces this direct infringement through its affirmative acts of manufacturing, selling, distributing, and/or otherwise making available the Accused Products, and providing technical guides, product datasheets, demonstrations, advertisements, installation guides, user manuals and other forms of support that induce its distributors, customers, and/or end users to directly infringe the '021 patent. The Accused Products are designed in such a way that when they are used for their intended purpose, the user infringes the '021 patent. SMA knows and intends that its distributors, customers, installers and/or end users that purchase the Accused Products will use those products for their intended purpose.

72.     By continuing to make, use, sell, offer to sell, and/or import the Accused Products after SMA first had notice of Tigo's allegations of infringement, SMA has indirectly infringed and continues to indirectly infringe by contributing to the infringement of one or more claims of the '021 patent pursuant to 35 U.S.C. § 271(c).  Defendant's affirmative acts of manufacturing, selling, offering for sale, and/or importing the Accused Products, in this District and elsewhere in the United States, contribute to Defendant's customers and end-users directly infringing the '021 patent with the Accused Products.  The Accused Products are not a staple article or commodity of commerce, have no substantial non-infringing uses, and are known by SMA to be especially made and/or especially adapted for use in infringement of the '021 patent.  Defendant has performed and continues to perform these affirmative acts with knowledge of the '021 patent and with the intent, or willful blindness, that they cause the direct infringement of the '021 patent.

73.     On information and belief, Tigo has suffered and continues to suffer damages as a result of SMA's infringement of the '021 patent in an amount to be determined at trial.

74.     On information and belief, SMA's infringement of the '021 patent is causing

irreparable harm for which Tigo has no adequate remedy at law unless SMA is enjoined by this Court. Under 35 U.S.C. § 283, Tigo is entitled to a permanent injunction against further infringement of the '021 patent.

75.     On information and belief, SMA has continued with its infringement after receiving notice from Tigo, despite the objectively high likelihood that its actions constitute infringement and SMA's subjective knowledge of this obvious risk.  As SMA has no good faith belief that it does not infringe the '021 patent, SMA's continued infringement is willful and deliberate, entitling Tigo to increased damages under 35 U.S.C. § 284 and to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

## COUNT IV
### (INFRINGEMENT OF U.S. PATENT NO. 9,966,848)

76.     Plaintiff repeats and realleges paragraphs 1-75 as if fully set forth at length herein.

77.     SMA has and continues to directly infringe one or more claims of the '848 patent in this judicial district and elsewhere in the United States.

78.     Upon information and belief, SMA makes, uses, sells, offers for sale, and/or imports into the United States the Accused Products.

79.     SMA directly infringes the '848 patent under 35 U.S.C. § 271(a), literally and/or under the doctrine of equivalents, by making, using, offering for sale, selling, and/or importing the Accused Products in the United States.

80.     For example, SMA directly infringes at least Claim 1 of the '848 patent, literally and/or under the doctrine of equivalents, through its making, using, offering for sale, selling, and/or importing the Accused Products.

81.     Claim 1 of the '848 patent recites:

An apparatus, comprising:

a first stage power converter to generate a first output from a direct current input;

a second stage power converter connected to the first stage power converter to convert the first output to a second output;

a micro-controller;

a power absorption circuit; and

a control circuit coupled with the first stage power converter and the second stage power converter, the control circuit powered by the first output to control the second stage power converter, wherein:

when the second stage power converter is in a first mode of not providing the second output to power the micro-controller, the control circuit monitors a voltage of the first output powering the power absorption circuit and signals the second stage power converter to remain in the first mode during a time period in which the voltage is below a threshold; and

when the voltage is above the threshold, the control circuit signals the second stage power converter to enter a second mode of providing the second output to power the micro-controller.

82.    On information and belief, the JMS-F device is an apparatus that comprises electronic circuitry that includes a two-stage power converter at least partially within the box labelled MCU in the figure below, wherein the first stage power converter is configured to convert the direct current input into a first output, and the second stage power converter is connected to the first stage power converter and configured to be powered by the first output to generate a second output:

## 5. Turn-on Mode of JMS-F



When the AC breaker is closed, the inverter with built-in transmitter function sends the signal "permission-to-operate" through the DC bus. JMS-F receives the signal and enters the turn-on mode. Then the MOSFET Q3 is turned off and the MOSFET Q2/Q20 is turned on. JMS-F turns on and the energy generated by the PV module will be delivered to the AC grid through the inverter.

Exhibit 7, JMS-F Installation Manual at 10.

83.     On information and belief, the JMS-F devices comprise a micro-controller powered by the second output, as shown in the image below of the circuit board from the JMS-F:



84.     On information and belief, the JMS-F device contains electronic circuitry in the integrated circuit identified above that include a two-stage power converter. The first stage of this power converter receives a direct current input from PV module, and provides that power to either a power absorption circuit or to the second stage of the power converter in the integrated circuit identified above. The JMS-F device's control circuit powers the absorption circuit from the first stage of the power converter until it determines that the available power from the module is above a threshold sufficient to hold approximately 8V on an appropriate load (e.g., holding 8V while drawing approximately 15 mA).). The JMS-F device's control circuit then disconnects the first stage of the power converter from the power absorption circuit and causes the second stage of the power converter to begin providing power to the microcontroller.

85.     Thus, on information and belief the JMS-F devices comprise a control circuit coupled with the first stage power converter and the second stage power converter, the control circuit powered

by the first output to control the second stage power converter, wherein when the second stage power converter is in a first mode of not providing the second output to power the micro-controller, the control circuit monitors a voltage of the first output powering the power absorption circuit and signals the second stage power converter to remain in the first mode during a time period in which the voltage is below a threshold, and when the voltage is above the threshold, the control circuit signals the second stage power converter to enter a second mode of providing the second output to power the micro-controller.

86.     The full extent of SMA's infringement is not presently known to Plaintiff.   On information and belief, SMA has made, used, sold, offered for sale, and/or imported products under different names or part numbers that infringe the '848 patent in a similar manner. Plaintiff makes this preliminary identification of infringing products and infringed claims without the benefit of discovery or claim construction in this action, and expressly reserves the right to augment, supplement, and revise its identification based on additional information obtained through discovery or otherwise.

87.     SMA has had notice of and have been aware of the '848 patent and its infringement of the '848 patent by no later than October 1, 2021, when Tigo sent SMA a letter notifying SMA of its infringement of the '848 patent.

88.     Upon information and belief, since at least the above-mentioned date when SMA was on notice of its infringement, SMA has actively induced, under U.S.C. § 271(b), its distributors and/or customers that use, sell, offer for sale, import and/or install the Accused Products that include all of the limitations of one or more claims of the '848 patent to directly infringe one or more claims of the '848 patent, with knowledge, and/or with willful blindness of the fact, that the induced acts constitute infringement of the '848 patent. SMA's distributors, customers, installers and/or end users have directly infringed and are directly infringing, either literally and/or under the doctrine of equivalents,

the inventions claimed in the '848 patent through their selling, offering for sale, importing, installing and/or using the Accused Products. SMA induces this direct infringement through its affirmative acts of manufacturing, selling, distributing, and/or otherwise making available the Accused Products, and providing technical guides, product datasheets, demonstrations, advertisements, installation guides, user manuals and other forms of support that induce its distributors, customers, and/or end users to directly infringe the '848 patent. The Accused Products are designed in such a way that when they are used for their intended purpose, the user infringes the '848 patent. SMA knows and intends that its distributors, customers, installers and/or end users that purchase the Accused Products will use those products for their intended purpose.

89.     By continuing to make, use, sell, offer to sell, and/or import the Accused Products after SMA first had notice of Tigo's allegations of infringement, SMA has indirectly infringed and continues to indirectly infringe by contributing to the infringement of one or more claims of the '848 patent pursuant to 35 U.S.C. § 271(c).  SMA's affirmative acts of manufacturing, selling, offering for sale, and/or importing the Accused Products, in this District and elsewhere in the United States, contribute to Defendant's customers and end-users directly infringing the '848 patent with the Accused Products. The Accused Products are not a staple article or commodity of commerce, have no substantial non-infringing uses, and are known by SMA to be especially made and/or especially adapted for use in infringement of the '848 patent.  Defendant has performed and continues to perform these affirmative acts with knowledge of the '848 patent and with the intent, or willful blindness, that they cause the direct infringement of the '848 patent.

90.     On information and belief, Tigo has suffered and continues to suffer damages as a result of SMA's infringement of the '848 patent in an amount to be determined at trial.

91.     On information and belief, SMA's infringement of the '848 patent is causing

irreparable harm for which Tigo has no adequate remedy at law unless SMA is enjoined by this Court. Under 35 U.S.C. § 283, Tigo is entitled to a permanent injunction against further infringement of the '848 patent.

92.     On information and belief, SMA has continued with its infringement after receiving notice from Tigo, despite the objectively high likelihood that its actions constitute infringement and SMA's subjective knowledge of this obvious risk.  As SMA has no good faith belief that it does not infringe the '848 patent, SMA's continued infringement is willful and deliberate, entitling Tigo to increased damages under 35 U.S.C. § 284 and to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

## COUNT V
### (INFRINGEMENT OF U.S. PATENT NO. 10,256,770)

93.     Plaintiff repeats and realleges paragraphs 1-92 as if fully set forth at length herein.

94.     SMA has and continues to directly infringe one or more claims of the '770 patent in this judicial district and elsewhere in the United States.

95.     Upon information and belief, SMA makes, uses, sells, offers for sale, and/or imports into the United States the Accused Products.

96.     SMA directly infringes the '770 patent under 35 U.S.C. § 271(a), literally and/or under the doctrine of equivalents, by making, using, offering for sale, selling, and/or importing the Accused Products in the United States.

97.     For example, SMA directly infringes at least Claim 1 of the '770 patent, literally and/or under the doctrine of equivalents, through its making, using, offering for sale, selling, and/or importing the Accused Products.

98.     Claim 12 of the '770 patent recites:

A photovoltaic panel, comprising:

at least one photovoltaic cell;

a local unit configured on the photovoltaic panel, the local unit having:

a voltage regulator coupled to the at least one photovoltaic cell to receive electric power generated by the at least one photovoltaic cell; and

a controller coupled to the voltage regulator;

wherein the voltage regulator provides a power output of the photovoltaic panel using the electric power generated by the at least one photovoltaic cell;

wherein the controller communicates with a remote unit, disposed at a location remote from the local unit, to control operations of the voltage regulator;

wherein the controller detects an anomaly in heartbeat signals from the remote unit; and

wherein in response to the anomaly, the controller causes the voltage regulator to reduce the power output of the photovoltaic panel.

99.     As one non-limiting example of said infringement, on information and belief, the JMS-F device is designed and intended to be installed onto a photovoltaic panel containing at least one photovoltaic cell, and to be a local unit configured on the photovoltaic panel:

## 8. Installation Steps

JMS-F installation is straightforward. All JMS-F units comes equipped with a metal buckle that can be easily attached to the aluminum frame of the PV module. Simply insert the buckle of the JMS-F into the aluminum frame of the PV module and tighten the washer screw (M4*15) through the mounting holes to a torque of 2.0~2.5 Nm (17.7~22.1in.lb).



Exhibit 7, JMS-F Installation Manual at 13-14. *See also* https://my.sma-service.com/s/article/Grounding-the-JMS-F-Device-to-the-PV-Panel-Frame?language=en_US

(indicating that the "JMS-F devices needs to be securely snapped onto the aluminum frame of the PV panel" for grounding purposes):

1. The metal mounting buckle of each JMS-F device needs to be securely snapped onto the aluminum frame of the PV panel, as shown in the picture below.
- You should hear a "scraping" sound as you slide the mounting buckles onto the frame, which is caused by the burr breaking the insulation layer of the PV panel frame.




    100.    On information and belief, the JMS-F devices comprises a voltage regulator coupled to the at least one photovoltaic cell to receive electric power generated by the at least one photovoltaic cell (at least partially within the MCU, which is illustrated with a 1V output for when Q2/Q20 are open) and a controller coupled to the voltage regulator (also at least partially within the MCU), wherein

the voltage regulator provides a power output of the photovoltaic panel using the electric power generated by the at least one photovoltaic cell (by closing Q2/Q20):



Exhibit 7, JMS-F Installation Manual at 10.

101.    On information and belief, the JMS-F devices comprises a micro-controller (MCU) that communicates with a remote unit, disposed at a location remote from the local unit (e.g., the SMA inverter) to control operation of the voltage regulator (e.g., in response to the presence or absence of various signals, such as a SunSpec signal):



Exhibit 7, JMS-F Installation Manual at 10.  In particular, the JMS-F contains a MCU that can receive

signals from the inverter to turn on the PV module and/or in response to the presence or absence of

various signals from the inverter will shut down the power output from the PV module:

## 2. Function Description

The JMTHY JMS-F is qualified as PV rapid shutdown equipment (PVRSE) which can
achieve module-level rapid shutdown. Which in turn will significantly improve the
safety of PV power generation systems. JMS-F uses PLC communication. The signal
is transmitted by the inverter with built-in transmitter function through the DC bus.
After JMS-F receives the signal, the switch turns on and the energy generated by the
PV module will be delivered to the AC grid through the inverter. When an emergency
situation occurs, the AC power can be turned off by switching off the AC breaker in
the cabinet, so that the inverter with built-in transmitter function stops sending signals,
and the JMS-F will shutdown the power output, then eliminate the high voltage on DC
bus, it can improve the safety of the PV system.

Exhibit 7, JMS-F Installation Manual at 5.

102.    On information and belief, the JMS-F devices comprises a sensor that monitors for an anomaly (e.g., an absence of signals from the SMA inverter), and in response to detecting an absence of signals from a remote unit (e.g., the SMA inverter), the MCU causes the voltage regulator to shut down the power output of the photovoltaic panel:

## 2. Function Description

The JMTHY JMS-F is qualified as PV rapid shutdown equipment (PVRSE) which can achieve module-level rapid shutdown. Which in turn will significantly improve the safety of PV power generation systems. JMS-F uses PLC communication. The signal is transmitted by the inverter with built-in transmitter function through the DC bus. After JMS-F receives the signal, the switch turns on and the energy generated by the PV module will be delivered to the AC grid through the inverter. When an emergency situation occurs, the AC power can be turned off by switching off the AC breaker in the cabinet, so that the inverter with built-in transmitter function stops sending signals, and the JMS-F will shutdown the power output, then eliminate the high voltage on DC bus, it can improve the safety of the PV system.

Exhibit 7, JMS-F Installation Manual at 5.

103.    The full extent of SMA's infringement is not presently known to Plaintiff.   On information and belief, SMA has made, used, sold, offered for sale, and/or imported products under different names or part numbers that infringe the '770 patent in a similar manner. Plaintiff makes this preliminary identification of infringing products and infringed claims without the benefit of discovery or claim construction in this action, and expressly reserves the right to augment, supplement, and revise its identification based on additional information obtained through discovery or otherwise.

104.    On information and belief, SMA has known of the '770 patent and its use by SunSpec-compliant rapid-shutdown devices since at least as early as 2019.

105.    SMA has had notice of and have been aware of the '770 patent and its infringement of

the '770 patent by no later than October 1, 2021, when Tigo sent SMA a letter notifying SMA of its infringement of the '770 patent.

106.    Upon information and belief, since at least the above-mentioned date when SMA was on notice of its infringement, SMA has actively induced, under U.S.C. § 271(b), its distributors and/or customers that use, sell, offer for sale, import and/or install the Accused Products that include all of the limitations of one or more claims of the '770 patent to directly infringe one or more claims of the '770 patent, with knowledge, and/or with willful blindness of the fact, that the induced acts constitute infringement of the '770 patent. SMA's distributors, customers, installers and/or end users have directly infringed and are directly infringing, either literally and/or under the doctrine of equivalents, the inventions claimed in the '770 patent through their selling, offering for sale, importing, installing and/or using the Accused Products. SMA induces this direct infringement through its affirmative acts of manufacturing, selling, distributing, and/or otherwise making available the Accused Products, and providing technical guides, product datasheets, demonstrations, advertisements, installation guides, user manuals and other forms of support that induce its distributors, customers, and/or end users to directly infringe the '770 patent. The Accused Products are designed in such a way that when they are used for their intended purpose, the user infringes the '770 patent. SMA knows and intends that its distributors, customers, installers and/or end users that purchase the Accused Products will use those products for their intended purpose.

107.    By continuing to make, use, sell, offer to sell, and/or import the Accused Products after SMA first had notice of Tigo's allegations of infringement, SMA has indirectly infringed and continues to indirectly infringe by contributing to the infringement of one or more claims of the '770 patent pursuant to 35 U.S.C. § 271(c).  Defendant's affirmative acts of manufacturing, selling, offering for sale, and/or importing the Accused Products, in this District and elsewhere in the United States,

contribute to Defendant's customers and end-users directly infringing the '770 patent with the Accused Products. The Accused Products are not a staple article or commodity of commerce, have no substantial non-infringing uses, and are known by SMA to be especially made and/or especially adapted for use in infringement of the '770 patent. Defendant has performed and continues to perform these affirmative acts with knowledge of the '770 patent and with the intent, or willful blindness, that they cause the direct infringement of the '770 patent.

108.    On information and belief, Tigo has suffered and continues to suffer damages as a result of SMA's infringement of the '770 patent in an amount to be determined at trial.

109.    On information and belief, SMA's infringement of the '770 patent is causing irreparable harm for which Tigo has no adequate remedy at law unless SMA is enjoined by this Court. Under 35 U.S.C. § 283, Tigo is entitled to a permanent injunction against further infringement of the '770 patent.

110.    On information and belief, SMA has continued with its infringement after receiving notice from Tigo, despite the objectively high likelihood that its actions constitute infringement and SMA's subjective knowledge of this obvious risk. As SMA has no good faith belief that it does not infringe the '770 patent, SMA's continued infringement is willful and deliberate, entitling Tigo to increased damages under 35 U.S.C. § 284 and to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

### COUNT VI
(INFRINGEMENT OF U.S. PATENT NO. 10,333,405)

111.    Plaintiff repeats and realleges paragraphs 1-110 as if fully set forth at length herein.

112.    SMA has and continues to directly infringe one or more claims of the '405 patent in this judicial district and elsewhere in the United States.

113.    Upon information and belief, SMA makes, uses, sells, offers for sale, and/or imports

into the United States the Accused Products.

114.    SMA directly infringes the '405 patent under 35 U.S.C. § 271(a), literally and/or under the doctrine of equivalents, by making, using, offering for sale, selling, and/or importing the Accused Products in the United States.

115.    For example, SMA directly infringes at least Claim 1 of the '405 patent, literally and/or under the doctrine of equivalents, through its making, using, offering for sale, selling, and/or importing the Accused Products.

116.    Claim 1 of the '405 patent recites:

An apparatus, comprising:

a micro-controller;

a first stage power converter to generate a first output from a direct current input;

a switchable load powered by the first output;

a control circuit powered by the first output; and

a second stage power converter connected to the first stage power converter and configured to convert the first output to a second output;

wherein the control circuit is configured to block the second stage power converter from powering the micro-controller using the second output in a time period that is after the control circuit is powered by the first output and before a predefined condition is met in the control circuit; and

wherein the control circuit is configured to signal the switchable load to be in a first state of consuming the first output during the time period and to be in a second state of not consuming the first output after the time period.

117.    As one non-limiting example of said infringement, on information and belief, the JMS-F device is an apparatus comprising a microcontroller (MCU):



Exhibit 7, JMS-F Installation Manual at 10.

118.    On information and belief, the JMS-F devices comprise electronic circuitry that includes a two-stage power converter at least partially within the box labelled MCU in the figure below, wherein the first stage power converter is configured to convert the direct current input into a first output, and the second stage power converter is connected to the first stage power converter and configured to be powered by the first output to generate a second output:

## 5. Turn-on Mode of JMS-F



When the AC breaker is closed, the inverter with built-in transmitter function sends the signal "permission-to-operate" through the DC bus. JMS-F receives the signal and enters the turn-on mode. Then the MOSFET Q3 is turned off and the MOSFET Q2/Q20 is turned on. JMS-F turns on and the energy generated by the PV module will be delivered to the AC grid through the inverter.

Exhibit 7, JMS-F Installation Manual at 10.

119.    On information and belief, the JMS-F devices comprise a switchable load powered by the first output and a control circuit powered by the first output as shown in the image below of the circuit board from the JMS-F:



120.    On information and belief, the JMS-F device contains electronic circuitry in the integrated circuit identified above that include a two-stage power converter. The first stage of this power converter receives a direct current input from PV module, and provides that power to either a power absorption circuit or to the second stage of the power converter in the integrated circuit identified above. The JMS-F device's control circuit powers the absorption circuit from the first stage of the power converter until it determines that the available power from the module is above a threshold sufficient to hold approximately 8V on an appropriate load (e.g., holding 8V while drawing approximately 15 mA). The JMS-F device's control circuit then disconnects the first stage of the power converter from the power absorption circuit and causes the second stage of the power converter to begin providing power to the microcontroller.

121.    Thus, on information and belief, the control circuit in the JMS-F devices is configured to block the second stage power converter from powering the micro-controller using the second output

in a time period that is after the control circuit is powered by the first output and before a predefined condition is met in the control circuit and is configured to signal the switchable load to be in a first state of consuming the first output during the time period and to be in a second state of not consuming the first output after the time period.

122.    The full extent of SMA's infringement is not presently known to Plaintiff.   On information and belief, SMA has made, used, sold, offered for sale, and/or imported products under different names or part numbers that infringe the '405 patent in a similar manner. Plaintiff makes this preliminary identification of infringing products and infringed claims without the benefit of discovery or claim construction in this action, and expressly reserves the right to augment, supplement, and revise its identification based on additional information obtained through discovery or otherwise.

123.    SMA has had notice of and have been aware of the '405 patent and its infringement of the '405 patent by no later than October 1, 2021, when Tigo sent SMA a letter notifying SMA of its infringement of the '405 patent.

124.    Upon information and belief, since at least the above-mentioned date when SMA was on notice of its infringement, SMA has actively induced, under U.S.C. § 271(b), its distributors and/or customers that use, sell, offer for sale, import and/or install the Accused Products that include all of the limitations of one or more claims of the '405 patent to directly infringe one or more claims of the '405 patent, with knowledge, and/or with willful blindness of the fact, that the induced acts constitute infringement of the '405 patent. SMA's distributors, customers, installers and/or end users have directly infringed and are directly infringing, either literally and/or under the doctrine of equivalents, the inventions claimed in the '405 patent through their selling, offering for sale, importing, installing and/or using the Accused Products. SMA induces this direct infringement through its affirmative acts of manufacturing, selling, distributing, and/or otherwise making available the Accused Products, and

providing technical guides, product datasheets, demonstrations, advertisements, installation guides, user manuals and other forms of support that induce its distributors, customers, and/or end users to directly infringe the '405 patent. The Accused Products are designed in such a way that when they are used for their intended purpose, the user infringes the '405 patent. SMA knows and intends that its distributors, customers, installers and/or end users that purchase the Accused Products will use those products for their intended purpose.

125.    By continuing to make, use, sell, offer to sell, and/or import the Accused Products after SMA first had notice of Tigo's allegations of infringement, SMA has indirectly infringed and continues to indirectly infringe by contributing to the infringement of one or more claims of the '405 patent pursuant to 35 U.S.C. § 271(c).  Defendant's affirmative acts of manufacturing, selling, offering for sale, and/or importing the Accused Products, in this District and elsewhere in the United States, contribute to Defendant's customers and end-users directly infringing the '405 patent with the Accused Products.  The Accused Products are not a staple article or commodity of commerce, have no substantial non-infringing uses, and are known by SMA to be especially made and/or especially adapted for use in infringement of the '405 patent.  Defendant has performed and continues to perform these affirmative acts with knowledge of the '405 patent and with the intent, or willful blindness, that they cause the direct infringement of the '405 patent.

126.    On information and belief, Tigo has suffered and continues to suffer damages as a result of SMA's infringement of the '405 patent in an amount to be determined at trial.

127.    On information and belief, SMA's infringement of the '405 patent is causing irreparable harm for which Tigo has no adequate remedy at law unless SMA is enjoined by this Court. Under 35 U.S.C. § 283, Tigo is entitled to a permanent injunction against further infringement of the '405 patent.

128.     On information and belief, SMA has continued with its infringement after receiving notice from Tigo, despite the objectively high likelihood that its actions constitute infringement and SMA's subjective knowledge of this obvious risk.  As SMA has no good faith belief that it does not infringe the '405 patent, SMA's continued infringement is willful and deliberate, entitling Tigo to increased damages under 35 U.S.C. § 284 and to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285..

## JURY DEMAND

129.     Plaintiff hereby requests a trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure.

## PRAYER FOR RELIEF

130.     Plaintiff respectfully requests that the Court find in its favor and against SMA and that the Court grant Plaintiff the following relief:

   a.  A judgment that SMA has directly infringed the Asserted Patents as alleged herein;

   b.  A judgment that SMA has indirectly infringed the Asserted Patents as alleged herein;

   c.  A permanent injunction against SMA and their affiliates, subsidiaries, assignees, employees, agents or anyone acting in privity or concert with them from infringing the Asserted Patents, including enjoining the making, offering to sell, selling, using, or importing into the United States products claimed in any of the claims of the Asserted Patents; using or performing methods claimed in any of the claims of the Asserted Patents; inducing others to use and perform methods that infringe any claim of the Asserted Patents; or contributing to others using and performing methods that infringe any claim of the Asserted Patents, until the expiration of the Asserted Patents.

   d.  A judgment for an accounting of all damages, past and future, including lost profits, sustained by Plaintiff as a result of the acts of infringement by SMA;

e.  A judgment and order requiring SMA to pay Plaintiff damages under 35 U.S.C. § 284, including up to treble damages as provided by 35 U.S.C. § 284, and any royalties determined to be appropriate;

f.  A judgment and order requiring SMA to pay Plaintiff pre-judgment and post-judgment interest on the damages awarded;

g.  A judgment and order finding this to be an exceptional case and requiring SMA to pay the costs of this action (including all disbursements) and attorneys' fees as provided by 35 U.S.C. § 285; and

h.  Such other and further relief as the Court deems just and equitable.


Dated: July 11, 2022

Respectfully submitted,

*/s/  Benjamin Schladweiler*
Benjamin Schladweiler (#4601)
GREENBERG TRAURIG, LLP
The Nemours Building
1007 North Orange Street
Suite 1200
Wilmington, DE 19801
Telephone: (302) 661-7352
Facsimile: (302) 661-7360
Email: schladweilerb@gtlaw.com

*Attorneys for Plaintiff Tigo Energy Inc.*

Nicholas Brown
GREENBERG TRAURIG, LLP
101 Second Street
Suite 2200
San Francisco, CA 94105
Telephone: (415) 655-1300
Facsimile: (415) 707-2010
Email: brownn@gtlaw.com

Jeffrey R. Colin
GREENBERG TRAURIG, LLP
One Vanderbilt Avenue
New York, NY 10017
Telephone: (212) 801-9200
Facsimile: (212) 801-6400
Email: colinj@gtlaw.com