## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

TIGO ENERGY INC.,

               Plaintiff,

       v.

SMA SOLAR TECHNOLOGY AMERICA
LLC and SMA SOLAR TECHNOLOGY AG,

             Defendants.

Civil Action No. 22-915-GBW

---

Benjamin J. Schladweiler, Renée Mosley Delcollo, GREENBERG TRAURIG, LLP, Wilmington, Delaware; Nicholas Brown, GREENBERG TRAURIG, LLP, San Francisco, California; Jeffrey R. Colin, GREENBERG TRAURIG, LLP, New York, NY.

      *Counsel for Plaintiff*

Adam W. Poff, Samantha G. Wilson, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; Philip W. Marsh, ARNOLD & PORTER, Palo Alto, CA.

      *Counsel for Defendants*

## MEMORANDUM OPINION

March 04, 2024
Wilmington, Delaware

GREGORY B. WILLIAMS
UNITED STATES DISTRICT JUDGE

Pending before the Court are the following motions: (1) Plaintiff Tigo Energy, Inc.'s ("Plaintiff" or "Tigo") Motion to Dismiss Defendant SMA Solar Technology America LLC's ("SMA America") Counterclaims XIII-XXI, D.I. 21; (2) Plaintiff's Motion to Strike Defendant SMA's Sixth Affirmative Defense, D.I. 21; and (3) Plaintiff's Motion to Strike Defendant SMA Solar Technology AG's ("SMA AG") Sixth Affirmative Defense, D.I. 99. Having reviewed each motion and all related briefing (D.I.s 22, 23, 25, 100, 102, 103), the Court finds that Plaintiff's Motions to Strike SMA America and SMA AG's Sixth Affirmative Defenses are granted with leave for Defendants to amend their respective pleadings. Plaintiff's Motion to Dismiss Counterclaims XIII- XVIII and XX is granted with leave for SMA America to amend, and Plaintiff's Motion to Dismiss Counterclaims XIX and XXI is granted with prejudice.

## I.   SUMMARY OF FACTS

Tigo and SMA America are Delaware corporations that compete in the industry of solar technology. D.I. 16, ¶¶ 1-2. SMA America is a wholly owned subsidiary of SMA America Holdings, LLC, which in turn is a subsidiary of SMA AG. *Id.*, ¶ 9. On July 11, 2022, Tigo filed several claims of infringement against both SMA America and SMA AG (collectively, "Defendants" or "SMA"), alleging that SMA manufactured and sold rapid shutdown technology that infringed several of Tigo's patents. *Id.* The patents asserted by Tigo include U.S. Patent Nos. 8,823,218 (the "'218 patent"), 8,933,321 (the "'321 patent"), 9,584,021 (the "'021 patent"), 9,966,848 (the "'848 patent"), 10,256,770 (the "'770 patent"), and 10,333,405 (the "'405 patent")

(collectively, the "Asserted Patents").[1] *Id.*, ¶¶ 19-25. In response, SMA argues, among other things, that Tigo is barred from seeking relief for any alleged acts of infringement. D.I. 20, ¶ 158.

According to SMA, Tigo joined the SunSpec Alliance ("SunSpec"), an industry group of solar and energy industry participants, in 2009. *Id.*, ¶ 160. SMA, who was also a member of SunSpec, contends that the group was "formed to . . . expand the market for renewable power" and encourage cooperation and information-sharing between its members. *Id.*, ¶ 159. As part of joining the group, SMA contends that each member, including SMA and Tigo, was required to execute SunSpec's written membership agreement (hereinafter, the "SunSpec Member Agreement" or the "Agreement"). *Id.*, ¶ 161. Once members, the parties could access and adopt specifications and similar protocols created by SunSpec to enable members to "'plug and play' system operability of solar power technologies, thereby reducing cost, promising technology innovation, and accelerating industry growth." *Id.*

The SunSpec Member Agreement, in turn, imposed several obligations on the members. In creating its specifications, for instance, SunSpec required each member to disclose any of the member's claims, patents, or patent applications that would be necessary to practice a proposed or adopted SunSpec specification ("Necessary Claims"). *Id.*, ¶¶ 161-62. Once members disclosed their respective Necessary Claims, the SunSpec Member Agreement required each member to negotiate licenses for its "Necessary Claims" with any other member who showed an interest in adopting their technology. *Id.* SMA alleges that, "[a]t a bare minimum," the Agreement required

---

[1] The Asserted Patents can be divided into two groups: the '218, '321, and '770 patents, which are directed to "[s]ystems and methods for an enhanced watchdog [signal] in solar installations," are hereinafter known as "Watchdog Signal Patents" and the '021, '848, and '405 patents, which are directed to an "auxiliary power supply," are the "Power Supply Patents."

members "to negotiate in good faith for the grant to each other Member a RAND License to any Necessary Claims." *Id.*, ¶ 161.

According to SMA, in September 2017, SunSpec adopted a specification known as the "Communication Signal for Rapid Shutdown SunSpec Interoperability Specification" ("Rapid Shutdown Specification"). *Id.*, ¶ 163. SMA contends that Tigo was actively involved in SunSpec's development of the Rapid Shutdown Specification by 2016 and, in December 2017, Tigo submitted claims from its patented technology as "Necessary Claims." *Id.*, ¶¶ 164-65.

SMA alleges that Tigo's membership in SunSpec coupled with Tigo's role in the development of the Rapid Shutdown Specification led SMA and other SunSpec members to believe that Tigo consented to their use of Tigo's patented technology. *Id.*, ¶ 167. According to SMA, many SunSpec members assumed that Tigo did not intend to initiate litigation against any member that used Tigo's technology in adopting the Rapid Shutdown Specification. *Id.*, ¶ 168. SMA claims that these expectations were fueled in part by Tigo's continued attempts to encourage industry players to adopt the Rapid Shutdown Specification. *Id.*, ¶¶ 168-69. According to SMA, Tigo was aware that several SunSpec members, included SMA, intended to do so. *Id.*, ¶ 168.

Yet, SMA contends that, for nearly two years, Tigo never asserted its patents against other SunSpec members. *Id.*, ¶ 172. Then, in December 2019, SMA contends that Tigo began to dispute that it was not a member of SunSpec. *Id.*, ¶¶ 172-73. According to SMA, around that same time, Tigo threatened some SunSpec members with potential patent litigation. *Id.* Finally, without any warning and without attempting to initiate license negotiations with SMA, SMA contends that Tigo filed suit before this Court on June 17, 2022, accusing SMA of infringing its patents. *Id.*, ¶¶ 174-75.

On October 14, 2022, SMA America filed its Answer and Complaint, D.I. 20, asserting that:

> Tigo willfully misled SunSpec Alliance members to believe that the Rapid Shutdown Specification was noninfringing and encouraged adoption of the technologies in the Rapid Shutdown Specification, knowing that it did not intend to uphold its obligations in the SunSpec Member[] Agreement and/or the representations and promises it made to the SunSpec Alliance and its members, so that it could subsequently assert infringement and extract licenses, monetary damages, seek an injunction, and/or establish a dominant market share by excluding, reducing, or delaying entry of competitive threats in the market for Rapid Shutdown Specification compliant systems, such as SMA America.

*Id.*, ¶ 178. SMA America filed several counterclaims against Tigo, including claims for: (1) breach of the SunSpec Member Agreement, (2) promissory estoppel; (3) declaration judgment under the doctrine of waiver; (4) declaration judgment by waiver; (5) tortious interference with business relations, (6) unfair competition; (7) false advertising; (8) violation of the Delaware Deceptive Trade Practices Act (DTPA), and (9) trade libel. SMA America also asserted affirmative defenses to Tigo's claims of infringement under "the doctrine of equitable estoppel, waiver, acquiescence, implied license, patent misuse, and unclean hands." *Id.*, ¶ 158. On November 13, 2023, SMA AG filed its Answer and Affirmative Defenses to Tigo's First Amended Complaint, D.I. 93, and similarly asserted affirmative defenses for "equitable estoppel, waiver, acquiescence, implied license, patent misuse, and unclean hands."[2] D.I. 93, ¶ 158.

---

[2] For purposes of this Motion, the Court finds no significant difference in the affirmative defenses asserted in SMA America and SMA AG's respective answers. Accordingly, the Court's opinion refers to each answer jointly as the "Answer."

## II.   LEGAL STANDARD

### A. Motion to Dismiss

To state a claim on which relief can be granted, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief . . . ." Fed. R. Civ. P. 8(a)(2). Such a claim must plausibly suggest "facts sufficient to 'draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Doe v. Princeton Univ.*, 30 F.4th 335, 342 (3d Cir. 2022) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Klotz v. Celentano Stadtmauer & Walentowicz LLP*, 991 F.3d 458, 462 (3d Cir. 2021) (quoting *Iqbal*, 556 U.S. at 678). But the Court will "'disregard legal conclusions and recitals of the elements of a cause of action supported by mere conclusory statements.'" *Princeton Univ.*, 30 F.4th at 342 (quoting *Davis v. Wells Fargo*, 824 F.3d 333, 341 (3d Cir. 2016)).

In evaluating a motion to dismiss, "'[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.'" *Pinnavaia v. Celotex Asbestos Settlement Tr.*, 271 F. Supp. 3d 705, 708 (D. Del. 2017) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1420 (3d Cir. 1997)), *aff'd*, 2018 WL 11446482 (3d Cir. Apr. 6, 2018). Federal Rule of Civil Procedure 12(b)(6) requires the court to accept all factual allegations in the complaint as true and view them in the light most favorable to plaintiff. *Id.* The court may consider matters of public record and documents attached to, "integral to[,] or explicitly relied upon in" the complaint. *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (cleaned up); *see also Spizzirri v. Zyla Life Scis.*, 802 F. App'x 738, 739 (3d Cir. 2020) (same). "A motion to dismiss 'may be granted only if, accepting all well-pleaded allegations in the complaint as true,

and viewing them in the light most favorable to plaintiff, plaintiff is not entitled to relief.'" *McCrone v. Acme Markets*, 561 F. App'x 169, 172 (3d Cir. 2014) (quoting *Burlington Coat Factory*, 114 F.3d at 1420).

### B. Motion to Strike

Pursuant to Federal Rule of Civil Procedure 12(f), a court "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." "The court may act: (1) on its own; or (2) on motion made by a party either before responding to the pleading or, if a response is not allowed, within 21 days after being served with the pleading." Fed. R. Civ. P. 12(f). Motions to strike are generally "disfavored." *Symbol Techs., Inc. v. Aruba Networks, Inc.*, 609 F. Supp. 2d 353, 356 (D. Del. Mar. 30, 2009) (citing *Seidel v. Lee*, 954 F. Supp. 810, 812 (D. Del. Dec. 30, 1996)). "When ruling on a motion to strike, the [c]ourt must construe all facts in favor of the nonmoving party and deny the motion if the defense is sufficient under law." *Symbol Techs.*, 609 F. Supp. 2d at 356 (quoting *Procter & Gamble Co. v. Nabisco Brands, Inc.*, 697 F. Supp. 1360, 1362 (D. Del. Oct. 21, 1988)) (internal quotations omitted). "[A] court should not grant a motion to strike a defense unless the insufficiency of the defense is 'clearly apparent.'" *Cipollone v. Liggett Grp., Inc.*, 789 F.2d 181, 188 (3d Cir. 1986), *rev'd on other grounds*, 505 U.S. 504, 112 (1992) (citations omitted).

### III.   DISCUSSIONS

#### A. SMA Fails to Plead its Equitable Defenses with Particularity.

In its Sixth Equitable Defense, SMA alleges that Tigo's infringement claims are barred under "the doctrine of equitable estoppel, waiver, acquiescence, implied license, patent misuse, and unclean hands." D.I. 22 at 18-24; D.I. 100 at 1-3. Tigo moves to strike SMA's Sixth Equitable Defense on grounds that SMA has failed to plead each defense with the requisite

particularity under Rule 9(b) of the Federal Rules of Civil Procedure. D.I. 22 at 5. As discussed in more detail below, the Court agrees.

In support of each affirmative defense, SMA alleges that Tigo led SMA, a fellow member of SunSpec, to believe that it was permitted to practice Tigo's patented technology. D.I. 20, ¶ 167. Specifically, SMA contends that Tigo's membership in SunSpec and its role in the development of the Rapid Shutdown Specification caused members of SunSpec, including SMA, to assume that Tigo "consented to the use of any potentially infringing technologies in connection with the adoption of the Rapid Shutdown Specification" and that Tigo "would not enforce its patents based on the practice of the Rapid Shutdown Specification." *Id.*, ¶¶ 167, 181. According to SMA, Tigo understood that members intended to practice its patented technology as part of their use of the Rapid Shutdown Specification. *Id.*, ¶ 170. Yet, SMA contends that Tigo made no efforts to negotiate licenses for its patented technology as required by the SunSpec Member Agreement. *Id.*, ¶ 175. Rather, SMA argues, Tigo waited several years for members to adopt the Rapid Shutdown Specification "so that it could subsequently assert infringement and extract licenses, monetary damages, seek an injunction, and/or establish a dominant market share." *Id.*

Where parties have alleged similar attempts by patent holders to induce infringement of their patented technology, courts have found that such allegations of "misleading conduct" sound in fraud and must be pled with particularity. *See Bayer CropScience AG v. Dow AgroSciences LLC*, No. CIV. 10-1045 RMB/JS, 2011 WL 6934557, at *3 (D. Del. Dec. 30, 2011) (requiring defendant to plead equitable estoppel with particularity); *Barry v. Stryker Corp.*, No. CV 20-1787-RGA-SRF, 2023 WL 2733652, at *8 (D. Del. Mar. 20, 2023), *report and recommendation adopted*, No. CV 20-1787-RGA, 2023 WL 3224498 (D. Del. May 3, 2023) (requiring heightened

pleadings where "[a] counterclaim or affirmative defense [] alleges fraudulent conduct"); *Hemy v. Perdue Farms, Inc.*, No. 11–888, 2011 WL 6002463, at *17 n. 11 (D.N.J. Nov.30, 2011) (holding that Rule 9(b) is triggered by allegations of "misleading conduct"). The same applies here where SMA has alleged that "Tigo willfully misled SunSpec Alliance members." D.I. 20, ¶ 176. Since SMA concedes that it has not pled fraud or mistake, however, the Court agrees that SMA has failed to plead its claim with the particularity required by Rule 9(b). *See* D.I. 23 at 11.

Accordingly, Tigo's Motion to Strike SMA's Sixth Affirmative Defense is granted with leave for SMA to amend its Answer to meet the pleading requirements of Rule 9(b). In pleading the affirmative defenses with particularity, SMA should identify with some specificity the misleading, deceptive, and fraudulent conduct that it believes induced infringement. While "pleading the date of, place of, substance of, and person making each fraudulent act is sufficient to satisfy Rule 9(b)," the Court recognizes that this level of detail may be difficult for SMA to ascertain prior to discovery. *See In re Fruehauf Trailer Corp.*, 250 B.R. 168, 198 (D. Del. 2000). Thus, SMA "need not plead the 'date, place or time' of the fraud," to meet the heightened pleading standards "so long as it uses an 'alternative means of injecting precision and some measure of substantiation into their allegations of fraud.'" *Id.* (internal quotations omitted). SMA must, however, "tie [the] allegation in its Sixth Affirmative Defense to any of the[] asserted patents," for instance, by alleging that the asserted patents contain "Necessary Claims." D.I. 102 at 1; *see also infra* III(B).

### B. SMA Fails to Plead the Necessary Elements of Patent Misuse.

In addition to the above, Tigo argues that SMA does not plead facts sufficient to demonstrate an attempt by Tigo to broaden the scope of its patents. D.I. 22 at 13. The Court agrees.

To plead patent misuse, a party must allege that a patent holder attempted to broaden the "physical or temporal scope" of the statutory grant awarded to it under U.S. patent law. *Princo Corp. v. Int'l Trade Comm'n*, 616 F.3d 1318 (Fed. Cir. 2010); *Bayer*, 2011 WL 6934557, at *4 (noting that, at the pleadings stage, patent misuse "requires only allegations of conduct that had the effect of impermissibly extending the limited protection from competition afforded by the ... patent") (internal quotations omitted). SMA contends that it has sufficiently pled patent misuse by highlighting attempts by Tigo "to obtain a market advantage that extends the patent beyond the statutory grant under the patent laws of the United States." D.I. 23 at 11-12.

SMA's pleadings, however, focus exclusively on Tigo's unwillingness to license or share its patented technology with the other SunSpec members. *See* D.I. 20, ¶ 167 ("Tigo's course of conduct represented to the SunSpec Alliance and its members, including SMA America, that the Rapid Shutdown Specification is an open specification that could be adopted on a royalty-free or, in the alternative, RAND basis."). According to SMA, Tigo had an obligation to license its technology as a member of SunSpec. *See* D.I. 20, ¶ 167. SMA alleges, however, that Tigo encouraged other SunSpec members to practice the Rapid Shutdown Specification "knowing that it did not intend to uphold its obligations in the SunSpec Membership Agreement and/or the representations and promises it made to the SunSpec Alliance and its members." *Id.*, ¶ 176. SMA contends that Tigo instead waited for members to adopt the Rapid Shutdown Specification so that it could subsequently "assert infringement and extract licenses." *Id.*, ¶ 167. According to SMA, Tigo's objective in doing so was to "exclud[e], reduc[e], or delay[] entry" of competitor products into the market for Rapid Shutdown technology. *Id.*

Patent misuse, however, "is not available to a presumptive infringer simply because a patentee engages in some kind of wrongful commercial conduct, *even conduct that may have*

*anticompetitive effects*." *Princo Corp. v. International Trade Communication*, 616 F.3d 1318, 1332 (Fed. Cir. 2010) (emphasis added). Rather, as noted by the Federal Circuit, the doctrine of patent misuse is about "patent leverage" and requires evidence that the patentee has used its patents to expand the reach of its awarded monopoly. *Id.* at 1329. SMA cannot meet this standard by alleging that Tigo misused its patents by refusing to negotiate licenses with members of SunSpec. *See id.*, ¶ 175. A patent by its nature awards patent holders a monopoly, and Tigo, as the patent holder, is "presumably free to license their patents to everyone—or no one." *Princo Corp. v. Int'l Trade Comm'n,* 616 F.3d 1318, 1340 (Fed. Cir. 2010). Further, SMA's allegations that Tigo *will* use its patents to "extract licenses" from SunSpec members, are also insufficient to support its claim for patent misuse. D.I. 20, ¶ 176. A patent holder who licenses his patents may commit patent misuse by conditioning its license agreements on "anticompetitive terms going beyond the scope of the patent grant." *C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1334, 1372 (Fed.Cir.1998). Here, however, SMA admits that Tigo has not negotiated with SMA or any other SunSpec Members for the grant of a license. D.I. 20, ¶ 344. Thus, SMA cannot demonstrate past attempts by Tigo to extract licenses with anti-competitive conditions or unfair terms.

Accordingly, Tigo's Motion to Strike SMA's defense for patent misuse is granted with leave for SMA to amend its Answer.

### C. SMA Fails to Plead a Sufficient Claim for Breach of Contract.

In Count XIII, SMA asserts that Tigo breached its obligations under the SunSpec Member Agreement "by not offering SMA America, as a member of SunSpec [], either a royalty-free or RAND license to the Asserted Patents and instead initiated litigation." D.I. 20, ¶ 333.

11

The SunSpec Member Agreement is subject to California Law. D.I. 22 at 5, D.I. 23 at 5. Accordingly, "[u]nder California law, a breach of contract includes the following elements: (1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) resulting damages to plaintiff." *Bradway v. Rao*, 2022 WL 1913775, at \*10 (E.D. Cal. June 3, 2022). Tigo contends that SMA's breach of contract claim fails because SMA does not adequately plead (1) that Tigo breached the SunSpec Member Agreement and (2) this alleged breach caused Tigo to suffer actual damages. D.I. 22 at 5.

### i. *SMA failed to assert that Tigo breached the SunSpec Member Agreement.*

In support of its claim for breach of contract, SMA alleges that Tigo was obligated under the SunSpec Member Agreement "to negotiate in good faith for the grant to each other [m]ember a RAND License to any Necessary Claims upon such terms and conditions as may be agreed to between such [m]embers." D.I. 20, ¶ 320. SMA contends that Tigo breached the Agreement by refusing to license its patented technology and instead pursuing litigation against SMA and the other SunSpec members. *Id.*, ¶ 333. While Tigo does not dispute that it has not negotiated a license to SMA for any of the Asserted Patents, Tigo argues that SMA fails to show that Tigo's refusal to license constitutes a breach of the SunSpec Member Agreement. D.I. 22 at 6. For the following reasons, the Court agrees.

As the party asserting breach of contract, SMA must "provide the 'grounds' of [their] 'entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 554,550 U.S. 544, 127 S.Ct. 1955, 1964–65 (2007) (internal citations omitted). In doing so, SMA must present specific factual allegations that identify the relevant contract and support its claims that the contract was in fact breached. *McAfee v. Francis*, No. 5:11-CV-00821-LHK, 2011 WL 3293759, at \*2 (N.D. Cal. Aug. 1, 2011). "[A]ny claim that, even when construed in the light most favorable to plaintiff,

fails to plead sufficiently all required elements of a cause of action" must be dismissed. *Student Loan Marketing Ass'n v. Hanes*, 181 F.R.D. 629, 634 (S.D.Cal.1998).

The SunSpec Member Agreement required its members to "'negotiate in good faith for the grant to each other Member a RAND License to any Necessary Claims' – not all patents that Member has." *Id.* at 8. Thus, to allege that Tigo breached the SunSpec Member Agreement by initiating litigation before this Court, SMA must assert that some or all of the Asserted Patents are "Necessary Claims" under the SunSpec Member Agreement. SMA contends that it has sufficiently identified the "Necessary Claims" by relying on "Tigo's infringement and other allegations for which claims [Tigo] contends are 'Necessary Claims.'" D.I. 23 at 5. SMA cannot, however, assert adequate support for its claim by relying on vague statements it attributes to Tigo.

SMA's alleges, for instance, that "[b]ased on Tigo's allegations, *it appears that Tigo's position assumes* that all the Accused Patents including 'Necessary Claims' for SunSpec's Rapid Shutdown Specification pursuant to the SunSpec Membership Agreement." D.I. 20, ¶ 329 (emphasis added). SMA contends that Tigo's comments "*suggest that Tigo believes* that the claims of the Power Supply Patents include 'Necessary Claims.'" *Id.* (emphasis added). From these statements, SMA determines, "in other words," that Tigo must be asserting "that SMA products that comply with the SunSpec Rapid Shutdown Specification infringe all of the Asserted Patents." *Id.*, ¶ 328. By relying on statements Tigo "appears" to make or "suggests" SMA has not shown that "Tigo has contended [or] is contending" that the Asserted Patents include Necessary Claims. *See* D.I. 23 at 5.

To adequately plead that Tigo breached its obligations under the SunSpec Member Agreement, SMA must connect Tigo's alleged misconduct, its unwillingness to license the Asserted Patents, with its clam that Tigo breached the SunSpec Member Agreement by, for

instance, refusing to negotiate licenses for "Necessary Claims." As SMA has not alleged that any or all of the Asserted Patents are "Necessary Claims," SMA's breach of contract claim fails.

### ii. *SMA has pled adequate harm.*

According to Tigo, SMA also fails to plead that it was harmed by Tigo's purported breach. D.I. 22 at 8. Under California law, "[d]amages for breach of contract include general (or direct) damages, which compensate for the value of the promised performance, and consequential damages, which are indirect and compensate for additional losses incurred as a result of the breach." *Speirs v. BlueFire Ethanol Fuels, Inc.*, 243 Cal. App. 4th 968, 989 (Cal. Ct. App. 2015). SMA argues that it properly pleads both direct and consequential damages. D.I. 23 at 5-6. The Court agrees.

According to SMA, its direct damages consist of "the cost and expense SMA needs to spend on resolving this dispute, [and] defending itself in the present litigation." *Id.* at 6. Tigo argues that SMA fails to identify "the specific harm caused by the breach." D.I. 22 at 8 (*citing Godo Kaisha IP Bridge 1 v. TCL Commc'n Tech. Holdings Ltd.*, 2017 WL 750700, at *4 (D. Del. Feb. 27, 2017), *report and recommendation adopted*, 2017 WL 1055958 (D. Del. Mar. 20, 2017)). This matter, however, is readily distinguishable from *Godo Kaisha IP Bridge 1*, where the Court dismissed a breach of contract counterclaim after finding that "injury or damages were [not] pleaded *at all* . . . ." *Godo Kaisha IP Bridge 1*, 2017 WL 750700, at *4 (emphasis added). Conversely, here, as in *Research In Motion Ltd. v. Motorola, Inc.*, SMA pleads that Tigo's refusal to negotiate a license in good faith has caused and will cause SMA to incur cost and other expenses associated with its litigation. D.I. 23 at 6; *Research In Motion Ltd. v. Motorola, Inc.*, 644 F. Supp. 2d 788, 797 (N.D. Tex. 2008) (finding that a plaintiff is assumed to suffer damages where it is forced to pursue litigation to enforce a contractual obligation to license and contends defendant

"already refused to negotiate fair terms outside this court"). Because SunSpec required its members to negotiate license agreements in good faith, the Court finds that the "costs and expense" associated with resolving a licensing dispute were at least reasonably foreseeable to the parties when they executed the SunSpec Member Agreements.

SMA further contends that it suffered consequential damages after Tigo published a press release "falsely stating" that "SMA ha[d] willfully infringed Tigo's patents." D.I. 23 at 6-7. SMA argues that the press release injured SMA by "discourage[ing] others from conducting business with SMA [] or [from] honor[ing] their contracts with SMA []." *Id.* According to Tigo, SMA fails to plead specific damages it suffered as a result of the press release. D.I. 22 at 9. Tigo contends that, instead, SMA improperly asserts hypothetical damages caused by "harms that SMA could face the threat of [], not harms that it has faced." *Id.* (internal quotations omitted). The Court disagrees. In addition to asserting damages for future loss of business, SMA alleges that the press release has already discouraged clients from "honoring their contracts." D.I. 20, ¶ 346. SMA further notes Tigo's own admission that its litigation with SMA has caused several suppliers to execute contracts with Tigo. *Id.* When taken as true and viewed in the light most favorable to SMA, these allegations are sufficient to support SMA's claims that it suffered consequential damages.

While SMA adequately pleads the damages element of its breach of contract counterclaim, SMA fails to plead sufficient factual allegations that Tigo breached the SunSpec Member Agreement by failing to license the Asserted Patents. Accordingly, the Court grants Tigo's Motion to Dismiss with leave for SMA to amend its Answer to identify which claims of the Asserted Patents, if any, SMA asserts are "Necessary Claims" under the SunSpec Member Agreement.

### D. SMA Fails to Plead Sufficient Facts to Support a Cause of Action for Promissory Estoppel, Waiver, and Equitable Estoppel.

Tigo similarly moves the Court to dismiss SMA's promissory estoppel, waiver, and equitable estoppel counterclaims. D.I. 22 at 10-13. As a preliminary matter, the Court notes that the equitable doctrines raised in support of each counterclaim are typically asserted as affirmative defenses.[3] Because courts in this district have permitted parties to assert the equitable doctrines as counterclaims, however, the Court agrees with SMA that the claims do not fail for this reason alone. D.I. 23 at 9-10.

Yet, as noted with respect to SMA's equitable defenses, "[a] claim of patent unenforceability premised upon inequitable conduct is a claim sounding in fraud." *Senju Pharm. Co. v. Apotex, Inc.*, 921 F. Supp. 2d 297, 306 (D. Del. 2013). Thus, the heightened pleading standards are required to plead "a claim for inequitable conduct" just as they are "'required to plead [an equitable] affirmative defense with particularity under Rule 9(b).'" *Id.* (citing *Bayer*, 2011 WL 6934557, at *3). In other words, SMA's equitable defenses and counterclaims must "rise or fall together." *Id.* Accordingly, for the reasons discussed above, *see supra* III(A), and for the additional reasons outlined below, Tigo's Motion to Dismiss SMA's equitable counterclaims is granted without prejudice and with leave for SMA to amend.

#### i. *SMA has failed to plead promissory estoppel.*

Tigo contends that SMA's promissory estoppel counterclaim should be dismissed for the additional reason that SMA fails to plead an actionable promise. D.I. 22 at 10. For the following reasons, the Court agrees.

---

[3] In fact, the Court recognizes that SMA has asserted nearly identical affirmative defenses as part of its Sixth Defense to Tigo's allegations of infringement. *See supra* III(A).

"Under the doctrine of promissory estoppel, a plaintiff must prove by clear and convincing evidence that: (1) a promise was made; (2) it was the reasonable expectation of the promisor to induce action or forbearance on the part of the promisee; (3) the promisee reasonably relied on the promise and took action to his detriment; and (4) such promise is binding because injustice can be avoided only by enforcement of the promise." *Windsor I, LLC v. CWCapital Asset Mgmt. LLC*, 2019 WL 4733430, at \*11 (Del. Super. Ct. Sept. 27, 2019). In pleading promissory estoppel, the party must identify a promise that is both "definite and certain." *Id.*; *James Cable, LLC v. Millennium Digital Media Sys., L.L.C.*, No. CIV.A. 3637-VCL, 2009 WL 1638634, at \*5 (Del. Ch. June 11, 2009) ("Promissory estoppel requires 'a real promise, not just mere expressions of expectation, opinion, or assumption.' . . . [T]he promise must be reasonably definite and certain.").

Yet, as Tigo notes, "[p]romissory estoppel claims based on express promises in a written agreement . . . are impermissible." D.I. 22 at 10. In fact, "[p]romissory estoppel is meant for cases in which a promise, not being supported by consideration, would be unenforceable under conventional principles of contract law." *In re U.S. W., Inc. Sec. Litig.*, 201 F. Supp. 2d 302, 308 (D. Del. 2002) (internal quotations omitted); *see also Ameristar Casinos, Inc. v. Resorts Int'l Holdings, LLC*, No. CIV. A. 3685–VCS, 2010 WL 1875631, at \*13 (Del.Ch. May 11, 2010) ("[I]f a contract covers the subject matter, the defendant's conduct either violates the contract or not. If the defendant did not violate the contract governing the subject of the dispute, then the plaintiff cannot attempt to hold the defendant responsible by softer doctrines, and thereby obtain a better bargain than he got during the contract negotiations."). Thus, while equitable claims "may survive a motion to dismiss when the validity of the contract is in doubt or uncertain, [w]hen the complaint alleges an express, enforceable contract that controls the parties'

relationship," an equitable claim will be dismissed. *Corp. Comm'n of Mille Lacs Band of Ojibwe Indians v. Money Centers of Am., Inc.*, No. CIV. 12-1015 RHK, 2013 WL 5487417, at *7 (D. Minn. Sept. 30, 2013), *judgment entered*, 986 F. Supp. 2d 1062 (D. Minn. 2013).

SMA contends that its claim survives dismissal because promissory estoppel is pled as an "alternative cause of action" that assumes that the SunSpec Merger Agreement does not apply. D.I. 23 at 8-9. According to SMA, "Tigo itself disputes the existence of a contract under the SunSpec Member Agreement and disputes that Tigo is bound by its terms." *Id.* at 9. Thus, SMA argues that promissory estoppel is asserted as an "alternative" in response to Tigo's claims that there can be no breach of contract. *Id.* ("Tigo attempts to have it both ways, arguing that there was a contract when attempting to defeat the promissory estoppel counterclaim and arguing that there was no contract when dealing with the breach of contract allegation. Tigo's inconsistent arguments and positions justify SMA America's alternative pleading approach."). While the Court agrees that parties are generally permitted to plead alternative claims and facts in their pleadings,[4] the Court finds no evidence that SMA attempted to do so here.[5]

In support of its claim for promissory estoppel, SMA asserts that "Tigo [] made clear and definite promises to potential licensees such as SMA America through the SunSpec Member Agreement and their involvement and representations during the process of the SunSpec Alliance." D.I. 20, ¶ 349; *see also id.*, 349 ("A promise was made by Tigo, including *pursuant to the SunSpec Member Agreement . . . .*") (emphasis added). "The intended purpose of the SunSpec Member

---

[4] FED. R. CIV. P. 8(d)(2).

[5] Parties who choose to plead alternative claims "must use a formulation from which it can be reasonably inferred that this [is] what the plaintiff was doing." *Anthony Allega Cement Contractor, Inc. v. Johnson Controls Fed. Sys./Versar, LLC*, No. CV 18-875-SRF, 2019 WL 1792201, at *7 (D. Del. Apr. 24, 2019).

Agreement," according to SMA, "*was to induce reliance on the part of SunSpec Alliance members and potential adopters of the Rapid Shutdown Specification.*" *Id.*, ¶¶ 352, 354 (emphasis added). While SMA identifies other "separately made promises and given assurances" that Tigo made "to SunSpec and its members," SMA contends that these additional promises only "reinforced" the representations Tigo had already made through the SunSpec Member Agreement. *Id.*, ¶¶ 352-353. Thus, the Court agrees with Tigo that SMA has not pled sufficient "alternative" promises in support of its claim for promissory estoppel. D.I. 25 at 1-2.

Because promissory estoppel cannot be asserted where a valid, enforceable contract governs the promise at issue, Tigo's Motion to Dismiss is granted with leave for SMA to amend.

### ii. *SMA does not plead a plausible claim of waiver.*

Tigo argues that SMA failed to plead sufficient facts to support its claim for waiver. D.I. 20 at 12. Generally, a waiver claim requires allegations of "an existing right, knowledge of the right, [and] an actual intention to relinquish the right." *Sun Microsystems, Inc. v. Versata Enterprises, Inc.*, 630 F. Supp. 2d 395, 409 (D. Del. 2009).

In support of its claim, SMA contends that, through its participation in SunSpec, Tigo relinquished all rights to assert infringement against SMA and the other SunSpec members. D.I. 20, ¶ 361. SMA contends that, by executing the SunSpec Member Agreement, for instance, Tigo "consented to the use of any infringing technologies" and agreed to negotiate licenses for its patents on a RAND or royalty-free basis. *Id.* Further, by participating in the development of the Rapid Shutdown Specification and encouraging SunSpec members to adopt the Rapid Shutdown Specification, SMA argues that Tigo reinforced any presumptions held by members that Tigo would not assert its patents against members practicing the Rapid Shutdown Specification. *Id.*, ¶¶ 361-62. Taken together, SMA contends that Tigo's actions "evidenced an actual intention [by

Tigo] to relinquish its rights related to one or more of the Asserted Patents" and communicated to the SunSpec members that they were free to use Tigo's patented technology without fear of retaliation or litigation. *Id.*, ¶ 363. According to Tigo, SMA's claim for waiver fails for two reasons. D.I. 22 at 12.

First, Tigo argues that SMA relies on extra-contractual promises in support of its claim without addressing the SunSpec Member Agreement's merger clause. *Id.* The Court agrees. Because SMA relies on promises and assertions made separately from the SunSpec Member Agreement, its equitable claims, including waiver, fail unless SMA makes some indication that validity of the SunSpec Member Agreement is in doubt or uncertain. *See supra* III(D)(i). For instance, as noted above, if SMA intends to assert waiver as an alternative counterclaim under a theory that the claim assumes the unenforceability or inapplicability of the SunSpec Member Agreement, SMA must make that assertion clear. *Id.*

Second, Tigo contends that SMA's waiver counterclaim seeks relief in the form of a declaratory judgment holding that Tigo is barred from asserting infringement while the SunSpec Member Agreement only requires that members negotiate a license in good faith. D.I 22 at 12-13. Tigo contends that the Agreement does not entitle SMA or any other members to access Tigo's patented technology as they so choose. *Id.* Thus, Tigo argues that SMA's claim for declaratory relief "does not match the representations upon which SMA allegedly relied – i.e., that the 'Rapid Shutdown Specification could be practiced on a royalty-free or RAND basis'" and should therefore be dismissed. *Id.* at 12.

To assert a claim of waiver, SMA must "provide some evidence that Tigo had an "actual intention" to relinquish its patent rights or "made an affirmative grant of consent or permission" to SMA. *Sprint Commc'ns Co. L.P. v. Charter Commc'ns, Inc.*, 2021 WL 982726, at *11 (D. Del.

2021). While SMA can rely on the terms of the SunSpec Member Agreement to support its claim if, for instance, the Agreement prohibited Tigo from asserting infringement, SMA may also allege that Tigo undertook "conduct so inconsistent with the intent to enforce the right as to induce a reasonable belief that it has been relinquished." *Clear Blue Specialty Ins. Co. v. Ozy Media, Inc.*, No. 5:21-CV-08764-EJD, 2023 WL 3046796, at \*5 (N.D. Cal. Apr. 20, 2023). While the merger clause of the SunSpec Member Agreement may complicate SMA's ability to allege that its belief was "reasonable," at this stage of the pleading, the Court cannot find that SMA is wholly precluded from seeking a declaratory judgment.

Thus, SMA's waiver counterclaim is dismissed on grounds that waiver is not pled with Rule 9(b) particularity and relies on extrinsic evidence barred by the fully integrated SunSpec Member Agreement. SMA is granted leave to amend.[6]

### E. SMA Fails to Plead Tortious Interference, Unfair Competition, False Advertising, DDRPA, and Trade Libel.

Tigo also challenges SMA's counterclaims alleging tortious interference, unfair competition, false advertising and unfair competition, DDRPA, and trade libel. According to Tigo, each counterclaim "hinge[s] on statements made on a press release on its website about the infringement allegations in its Complaint." D.I. 22 at 13-14. Tigo contends that the press release published truthful information regarding its infringement lawsuit against SMA. Thus, Tigo argues that SMA's counterclaims are preempted by federal patent law and the absolute litigation privilege of the First Amendment. *Id.* at 15. Finally, Tigo argues that SMA fails to plead sufficient facts to

---

[6] For the same reasons discussed above, Tigo contends that SMA's equitable estoppel counterclaim should be dismissed. The Court agrees and thus grants Tigo's motion to dismiss SMA's counterclaim alleging equitable estoppel.

support the necessary elements of its claims for tortious interference, unfair competition, false advertising, and trade libel. *Id.* at 16-19.

As discussed below, the Court finds that SMA has not pled sufficient facts to overcome patent law preemption. The Court also finds that SMA has not, and cannot, plead plausible claims of false advertising and trade libel. Therefore, Tigo's Motion to Dismiss SMA's tortious interference, unfair competition, and DDTPA counterclaims is granted, with leave for SMA to amend its Answer. Tigo's Motion to Dismiss SMA's false advertising and trade libel counterclaims is granted with prejudice.

**i.** *SMA fails to plead objective bad faith.*

"[F]ederal patent law preempts state-law tort liability for a patentholder's good faith conduct in communications asserting infringement of its patent and warning about potential litigation." *PhishMe, Inc. v. Wombat Sec. Techs., Inc.*, No. CV 16-403-LPS-CJB, 2017 WL 3821107, at *5 (D. Del. Aug. 31, 2017) (citing *Globetrotter Software, Inc. v. Elan Comput. Grp.*, 362 F.3d 1367, 1374 (Fed. Cir. 2004)). "State-law claims [of this nature] can survive federal preemption only to the extent that those claims are based on a showing of 'bad faith' action in asserting infringement." *Id.* To avoid such preemption, a party must allege "bad faith . . . even if bad faith is not otherwise an element of the tort claim." *Id.* "In general, a threshold showing of incorrectness or falsity, or disregard for either, is required in order to find bad faith in the communication of information about the existence or pendency of patent rights." *Id.* (citing *Mikohn Gaming Corp. v. Acres Gaming, Inc.*, 165 F.3d 891, 897 (Fed. Cir. 1998)).

As the parties recognize, allegations of bad faith must have both objective and subjective components. D.I. 22 at 14; D.I. 23 at 13-14. "The objective component requires a showing that

the infringement allegations are 'objectively baseless.'" *800 Adept, Inc. v. Murex Sec., Ltd.*, 539 F.3d 1354, 1370 (Fed. Cir. 2008) (quoting *Globetrotter*, 362 F.3d at 1375). This in turn necessitates some evidence that "no reasonable litigant could realistically expect to secure favorable relief," and the party seeking to allege bad faith must "prove that the [counterclaim] defendant lacked probable cause ... and ... pressed the action for an improper, malicious purpose." *Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 62 (1993). As SMA has not asserted that the asserted patents include Necessary Claims under the SunSpec Member Agreement, *see supra* III(B), the Court agrees with Tigo that SMA has failed to allege sufficient facts to satisfy the objective component of bad faith. D.I. 22 at 14. The SunSpec Member Agreement required its members to license only those claims disclosed as Necessary Claims. Accordingly, by failing to allege that any claims of the Asserted Patents are Necessary Claims, SMA failed to support its allegation that Tigo's involvement in SunSpec left it "no reasonable basis to believe there was infringement by SMA America or its customers." *See* D.I. 23 at 13-14.

Tigo also contends that SMA's counterclaims are barred by the "absolute litigation privilege" of the First Amendment. D.I. 22 at 15-16. While the Court agrees that tortious interference, trade libel, and similar state law claims "are subject to the same first amendment requirements that govern actions for defamation,"[7] the absolute litigation privilege applies only were statements are made in the course of a judicial proceeding. *Associated/ACC Int'l Ltd. v. Dupont Flooring Sys. Franchise Co.*, No. Civ. A. 99–803–JJF, 2002 WL 32332751, at *10 (D. Del. Mar. 28, 2022). The privilege does not protect statements that, while they concern the judicial

---

[7] *Unelko Corp. v. Rooney*, 912 F.2d 1049, 1058 (9th Cir. 1990).

proceedings, are made outside of the proceedings themselves. *Id.* Thus, the Court finds that the absolute litigation privilege is inapplicable.

### ii. *SMA fails to plead the necessary elements of tortious interference and unfair competition.*

In addition to arguing SMA's tortious interference counterclaims are preempted by Federal patent law and barred under the First Amendment, Tigo contends that SMA has failed to allege facts sufficient to plead the necessary elements of each claim. D.I. 22 at 16-17.

To succeed on a claim of tortious interference, a party must show: "(1) the existence of a valid business relationship or expectancy; (2) knowledge of the relationship or expectancy on the part of the interferer; (3) intentional interference which induces or causes a breach or termination of the relationship or expectancy; and (4) resulting damages to the party whose relationship or expectancy has been disrupted." *Lucent Info. Mgmt., Inc. v. Lucent Techs. Inc.*, 5 F. Supp. 2d 238, 243 (D. Del. 1998). Similarly, an unfair competition claim requires allegations "that the plaintiff has a reasonable expectancy of entering a valid business relationship, with which the defendant wrongfully interferes, and thereby defeats the plaintiff's legitimate expectancy and causes him harm." *Rypac Packaging Mach. Inc. v. Coakley*, 2000 WL 567895, at *8 (Del. Ch. May 1, 2000).

Tigo contends that both counterclaims should be dismissed given SMA's "generalized allegations of harm" that fail to "identify a specific party who was prepared to entered [sic] into a business relationship but was dissuaded from doing so by the defendant." D.I. 22 at 17. According to Tigo, SMA does not identify a single business relationship that was lost due to Tigo's alleged interference, and Tigo argues that SMA "cannot rely on generalized allegations of harm.'" *Id.* (citing *Roxul USA, Inc. v. Armstrong World Indus., Inc.*, 2018 WL 810143, at *8 (D. Del. Feb. 9, 2018)). This argument fails, however, as SMA is not required "to identify . . . by name" the parties

who were dissuaded from doing business with SMA.  D.I. 23 at 17 (citing *Roxul USA, Inc. v. Armstrong World Indus., Inc.*, No. 17-1258, 2018 WL 810143, at *8 (D. Del. Feb. 9, 2018)). Moreover, SMA pleads that it "has received general communications and direct communications from its supplier, indicating awareness of Tigo's actions and statements in the relevant market and evidencing the impact of those statements."  D.I. 20, ¶ 387.  SMA further highlights Tigo's own statements recognizing that its infringement claims "have resulted in multiple suppliers signing license agreements with Tigo Energy."  *Id.*, ¶ 394.  The Court finds that, when viewed in the light most favorable to SMA, these allegations adequately support SMA's claims that it was harmed as a result of Tigo's tortious interference and unfair competition.[8]

In short, the Court grants Tigo's Motion to Dismiss SMA's claims for tortious interference and unfair competition on grounds that SMA has failed to plead sufficient bad faith.  *See supra* III(D)(2).

### iii.  *SMA has failed to plead false advertising and trade libel.*

"To prevail on a claim for false advertising under the Lanham Act, a plaintiff must prove: (1) the defendant has made a false or misleading statement regarding his own product or another's; (2) that has a tendency to deceive the intended audience; (3) the deception is material and is likely to influence purchasing decisions; (4) the advertised goods traveled in interstate commerce; and (5) there is a likelihood of injury to the plaintiff."  *North Atlantic Imports LLC, v. Loco-Crazy Good Cookers, Inc.*, No. CV 23-999-GBW-SRF, 2024 WL 245955, at *2 (D. Del. Jan. 23, 2024).

---

[8] For the same reasons, the Court finds that SMA sufficiently pleads facts in support of its claims that Tigo's interference caused "a breach or termination" of SMA's business relationships.  From SMA's allegations, the Court can reasonably infer that some of the suppliers that executed license agreements with Tigo may have been the same suppliers that sought to discuss the litigation with SMA.  Although SMA will have to identify the business relationships that were terminated or lost during later stages of the litigation, the Court finds that SMA has presented sufficient factual support to withstand a motion to dismiss.

"As the statute's text and the above-referenced factors indicate, in order to make out such a claim, a [party] must, inter alia, point to the defendant's use of 'commercial advertising or promotion' (that in turn contains the requisite false or misleading statements)." *Reybold Grp. of Companies, Inc. v. Does 1-20*, 323 F.R.D. 205, 210 (D. Del. 2017). According to Tigo, SMA's false advertising and trade libel counterclaims must be dismissed because SMA fails to show the press release was a "commercial advertising or promotion." *See* D.I. 23 at 19.

For a statement to be "commercial advertising or promotion," it must "consist of: (1) commercial speech; (2) by a defendant who is in commercial competition with plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services; [and] (4) that is disseminated sufficiently to the relevant purchasing public to constitute 'advertising' or 'promotion' within that industry." *Guardian Life Ins. Co. of Am. v. Am. Guardian Life Assur. Co.*, 1995 WL 723186, at *3 (E.D. Pa. Nov. 14, 1995). In turn, "commercial speech" refers to speech that does "no more than propose a commercial transaction" or be "related solely to the economic interests of the speaker and its audience." *Reybold Grp. of Companies, Inc. v. Does 1-20*, 323 F.R.D. 205, 210 (D. Del. 2017) (citing *Goodman v. Does*, No. 4:13-CV-139-F, 2014 WL 1310310, at *4 (E.D.N.C. Mar. 28, 2014)). For the following reasons, the Court finds that the press release is not "commercial speech."

While Tigo contends that the press release was intended to notify the public of the pending lawsuit between the parties, SMA argues that the press release was also commercial speech because it sought to encourage "those receiving the press release to visit Tigo's website." D.I. 23 at 19. "[T]o be commercial speech," however, "the statements must, *at a minimum*, criticize or unfavorably compare [SMA's] products." *Accenture*, 581 F. Supp. 2d at 668 (emphasis added). An instruction encouraging viewers to visit Tigo's website for more information on Tigo's

26

products, alone, does not amount to a critique of SMA's products. Nor can it be argued that the instruction unfavorably compared SMA's products with Tigo's technology. Because the press release does not meet the minimum requirements for "commercial speech," the Court agrees with Tigo that the press release is not commercial advertising. D.I. 22 at 20.

Accordingly, SMA fails to plead plausible claims for false advertising and trade libel.[9] Tigo's Motion to Dismiss is granted with prejudice.[10]

## IV.   CONCLUSION

For the foregoing reasons, Tigo's Motion to Strike SMA America and SMA AG's Sixth Affirmative Defense is GRANTED, with leave for SMA to amend. Tigo's Motion to Dismiss Counterclaims XIII- XVIII and XX of SMA America's Answer, D.I. 20, is granted with leave for SMA to amend, and Tigo's Motion to Dismiss Counterclaims XIX and XXI of SMA America's Answer, D.I. 20, is granted with prejudice because an amendment would be futile.

---

[9] Our courts "typically treat [DDTPA] claims and Lanham Act claims as rising and falling together. As such, SMA's trade Counterclaim XXI alleging trade libel under Delaware Common Law is dismissed for the same reasons as its false advertising counterclaim.

[10] Given the Court's finding that the press release is not commercial speech, the Court finds that an amendment to SMA's answer would not cure the deficiencies in its pleadings. *Jersey Dental Lab'ys v. Dentsply Int'l, Inc.*, No. CIV.A. 01-267-SLR, 2002 WL 2007916, at *1 (D. Del. Aug. 27, 2002), *aff'd in part sub nom. Howard Hess Dental Lab'ys Inc. v. Dentsply Int'l, Inc.*, 424 F.3d 363 (3d Cir. 2005) ("Though motions to amend are to be liberally granted, a district court 'may properly deny leave to amend where the amendment would not withstand a motion to dismiss.'").